Anthony Barnes (Bar No. 199048)
Jason Flanders (Bar No. 238007)
AQUA TERRA AERIS LAW GROUP LLP
828 San Pablo Ave., Ste. 115B
Albany, CA 94706
Phone: (415) 326-3173
Email: amb@atalawgroup.com

*Attorneys for Plaintiff*
CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation,<br><br>        Plaintiff,<br><br>        v.<br><br>RICHARD DAPELO, individually, and doing business as QUALITY STAINLESS TANKS, and QUALITY STAINLESS TANKS, an entity of unknown type,<br><br>        Defendants. | Civil Case No.:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)** |

California Sportfishing Protection Alliance ("CSPA" or "Plaintiff"), by and through its counsel, hereby alleges:

## I.    JURISDICTION AND VENUE

1.    This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

On November 21, 2016, CSPA issued a 60-day notice letter ("Notice Letter") to Quality Stainless Tanks and Richard "Rick" Dapelo, upon information and belief, the owner of the business. (Collectively, Quality Stainless Tanks and Richard Dapelo are referred to herein as "Defendants".) The Notice Letter was also to issued to Operations Manager Sean Headden. The Notice Letter informed Defendants and Mr. Headdan of their violations of California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollutant Discharge Elimination System (NPDES) General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ*) ("1997 Permit") and Order No. 2014-0057-DWQ ("2015 Permit") (collectively, hereinafter referred to as the "Storm Water Permit") and the Clean Water Act at the Quality Stainless Tanks facility  (the "QST Facility") located at 510 Caletti Ave, Windsor, CA 95492. The Notice Letter informed Defendants of CSPA's intent to file suit against Defendants to enforce the Storm Water Permit and the Clean Water Act.

2.    The Notice Letter was sent to the Owner and, separately, the Operations Manager of Quality Stainless Tanks as the owners and operators of the QST Facility, as required by 40 C.F.R. § 135.2(a)(1). The Notice Letter was also sent to the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, North Coast Region, ("Regional Board") as required by Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A). The Notice Letter is attached hereto as Exhibit A and is incorporated herein by reference.

3.     More than sixty (60) days have passed since the Notice Letter was served on the Defendants and the State and Federal agencies. CSPA is informed and believes, and thereon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA, 33 U.S.C. § 1319(g).

4.     Venue is proper in the Northern District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

5.     Plaintiff also seeks relief from Defendants' violations of the procedural and substantive requirements of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

## II.    __INTRODUCTION__

6.     With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial operations such as the QST Facility, pour into the storm drains and local waterways. The consensus among regulatory agencies and water quality specialists is that stormwater pollution accounts for more than half of the total pollution entering marine and river environments each year. These surface waters, known as Receiving Waters, are ecologically sensitive areas. Although pollution and habitat destruction have drastically diminished once-abundant and varied fisheries, these waters are still essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Stormwater and non-stormwater contain sediment, heavy metals, such as aluminum, iron, chromium, copper, lead, mercury, nickel, and zinc, as well as, high concentrations of nitrate plus nitrite as nitrogen, and other pollutants. Exposure to polluted stormwater harms the special aesthetic and recreational significance that the surface waters have for people in the surrounding communities. The public's use of the surface waters exposes many people to toxic metals and other contaminants in stormwater and non-stormwater discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to the Receiving Waters.

7.   High concentrations of total suspended solids ("TSS") degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis. TSS has been shown to alter predator-prey relationships (for example, turbid water may make it difficult for fish to hunt prey). Deposited solids alter fish habitat, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons ("PAHs"), are absorbed onto TSS. Thus, higher concentrations of TSS result in higher concentrations of toxins associated with those sediments. Inorganic sediments, including settleable matter and suspended solids, have been shown to negatively impact species richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces.

8.   Stormwater discharged with high pH can damage the gills and skin of aquatic organisms and cause death at levels above 10 standard units. The pH scale is logarithmic and the solubility of a substance varies as a function of the pH of a solution. A one whole unit change in standard units ("s.u.") represents a tenfold increase or decrease in ion concentration. If the pH of water is too high or too low, the aquatic organisms living within it will become stressed or die.

9.   This complaint seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees, for Defendants' substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from Defendants' operations at the QST Facility.[1]

10.   CSPA specifically alleges violations regarding Defendants discharge of pollutants from the QST Facility into waters of the United States; violations of the filing, monitoring and reporting, and best management practice requirements; and violations of other procedural and substantive requirements of the Storm Water Permit and the Clean Water Act, are ongoing and continuous.

**III.   PARTIES**

    **A.   California Sportfishing Protection Alliance**

11.   Plaintiff CSPA is a California non-profit public benefit organization with its principal place of business in Stockton, California. CSPA's organizational purpose is the protection, preservation,

---

[1] The QST Facility is fully described in Section V below.

and enhancement of fisheries and associated aquatic and riparian ecosystems of California's waterways, including Pruitt Creek and the Russian River, the Receiving Waters herein. Pruitt Creek is a tributary to the Russian River. This mission is implemented through active participation in water rights and water quality processes, education and organization of the fishing community, restoration efforts, and vigorous enforcement of environmental laws enacted to protect fisheries, habitat and water quality. Members of CSPA use and enjoy California's numerous rivers for recreation and other activities, including Pruitt Creek and the Russian River, where they view and enjoy wildlife, and routinely use the Russian River for rafting, fishing, birdwatching, wildlife viewing, and to engage in scientific study, among other things. CSPA's members derive significant and ongoing use and enjoyment from the aesthetic, recreational, and conservation benefits of the Russian River watershed.

12.     CSPA has approximately 2,000 members who live, recreate and work in and around waters of the State of California, including the Russian River. CSPA is dedicated to the preservation, protection, and defense of the environment, and the wildlife and the natural resources of all waters of California. To further these goals, CSPA actively seeks federal and state agency implementation of the Clean Water Act and other laws and, where necessary, directly initiates citizen enforcement. As referenced in Paragraph 11, members of CSPA use and enjoy the waters of the Russian River, into which Defendants have caused, are causing, and will continue to cause, pollutants to be discharged. Defendants' discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments. Thus, the interests of CSPA's members have been, are being, and will continue to be adversely affected by Defendants' ongoing failure to comply with the Clean Water Act and/or the Storm Water Permit. The relief sought herein will redress the harms to Plaintiff caused by Defendants' activities.

13.     Defendants' failure to comply with the procedural and substantive requirements of the Storm Water Permit and/or the Clean Water Act, including but not limited to Defendants' discharge of polluted stormwater and non-stormwater from the QST Facility, negatively impacts and impairs CSPA's members' use and enjoyment of these waters.

14.     Continuing commission of the acts and omissions alleged herein will irreparably harm CSPA's members, for which harm they have no plain, speedy, or adequate remedy at law.

Complaint for Declaratory and Injunctive Relief     5
and Civil Penalties

**B.    The Owners and Operators of the QST Facility**

15.    CSPA is informed and believes, and thereon alleges, that Quality Stainless Tanks is an entity of unknown type under the ownership of Defendant Richard Dapelo. Sonoma County records reveal a Fictitious Business Name Statement filed on November 10, 2014 for Business Name "Quality Stainless Tanks" with a named registrant of Richard B. Dapelo.

16.    CSPA is informed and believes, and thereon alleges, that Quality Stainless Tanks does not maintain a registered agent for service of process with the Office of the California Secretary of State, and that Richard Dapelo is an individual citizen.

17.    CSPA is informed and believes, and thereon alleges, that Richard Dapelo and Sean Headden are owners and/or operators of the QST Facility.

18.    Collectively, CSPA refers to Richard Dapelo and Sean Headden as "the Owners and/or Operators," defined herein as the Owners and/or Operators of the QST Facility.

**IV.    STATUTORY BACKGROUND**

**A.    The Clean Water Act**

19.    Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

20.    Section 402(p) of the CWA establishes a framework for regulating municipal and industrial stormwater discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial stormwater discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial stormwater dischargers. 33 U.S.C. § 1342.

21.    Section 301(b) of the Clean Water Act requires that, by March 31, 1989, all point source dischargers, including those discharging polluted stormwater, must achieve technology-based effluent limitations by utilizing Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for

1    conventional pollutants. *See* 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)-(iii).

2          22.    The Clean Water Act requires point source discharges of pollutants to navigable waters

3    be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

4          23.    The "discharge of a pollutant" means, among other things, "any addition of any pollutant

5    to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.

6          24.    The term "pollutant" includes "dredged spoil, solid waste, incinerator residue, sewage,

7    garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat,

8    wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste

9    discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.

10         25.    The term "point source" means any "discernible, confined and discrete conveyance,

11    including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container,

12    rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which

13    pollutants are or may be discharged." 33 U.S.C. § 1362(14); *see* 40 C.F.R. § 122.2.

14         26.    "Navigable waters" means "the waters of the United States." 33 U.S.C. 1362(7).

15         27.    "Waters of the United States" are defined as "navigable waters," and "all waters which

16    are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce,

17    including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7).

18         28.    The EPA promulgated regulations for the Section 402 NPDES permit program defining

19    "waters of the United States." *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to

20    include not only traditionally navigable waters but also other waters, including waters tributary to

21    navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams

22    that could affect interstate commerce.

23         29.    The Clean Water Act confers jurisdiction over non-navigable waters that are tributaries to

24    traditionally navigable waters where the non-navigable water at issue has a significant nexus to the

25    navigable water. *See Rapanos v. United States*, 547 U.S. 715 (2006); *see also N. Cal. River Watch v.*

26    *City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).

27         30.    A significant nexus is established if the "[receiving waters], either alone or in

28    combination with similarly situated lands in the region, significantly affect the chemical, physical, and

biological integrity of other covered waters." *Rapanos*, 547 U.S. at 779; *N. Cal. River Watch*, 496 F.3d at 999-1000.

31.    A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Rapanos*, 547 U.S. at 782; *N. Cal. River Watch*, 496 F.3d at 1000-1001.

32.    Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).

33.    The Defendants are "person[s]" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

34.    An action for injunctive relief is authorized under Section 505(a) of the CWA, 33 U.S.C. § 1365(a).

35.    Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $37,500 per day, pursuant to Sections 309(d) and 505 of the CWA. *See* 33 U.S.C. § 1319(d) and 1365(a); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4.

36.    Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees.

**B.    California's Storm Water Permit**

37.    Section 402(b) of the CWA, 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted stormwater. States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial stormwater discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial stormwater dischargers. *See id.*

38.    Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, the Administrator of the EPA has authorized California to issue NPDES permits, including general NPDES permits. California has

designated the State Water Resources Control Board ("State Board") and the Regional Water Quality Control Boards to administer its NPDES program. *City of Rancho Cucamonga v. Regional Water Quality Control Bd.*, 135 Cal. App. 4th 1377, 1380-81 (2006). In California, the State Board is charged with regulating pollutants to protect California's water resources. *See* Cal. Water Code § 13001.

39.     The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1342(b), (p), and 40 C.F.R § 123.25. Violations of the Storm Water Permit are also violations of the CWA. 1997 Permit, Section C(1); 2015 Permit, Section XXI(A).

40.     Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt Water Quality Standards, including water quality objectives and beneficial uses for navigable waters of the United States. The CWA prohibits discharges from causing or contributing to a violation of such state Water Quality Standards. *See* 33 U.S.C. § 1313(b)(1)(c); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. §§ 122.44(D)(1).

41.     The State Board elected to issue a statewide general permit for industrial discharges. The State Board issued the Storm Water Permit on or about November 19, 1991, modified the Storm Water Permit on or about September 17, 1992, and reissued the Storm Water Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

42.     On July 1, 2015, the 2015 Permit became effective, and was issued as NPDES No. CAS000001 (the same NPDES permit number as the 1997 Permit). The 2015 Permit superseded the 1997 Permit except for enforcement purposes. The substantive requirements of the 2015 Permit are the same or more stringent than the requirements of 1997 Permit.

43.     In order to discharge stormwater lawfully in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its terms, or obtain and comply with an individual NPDES permit. 1997 Permit, p. II-V; 2015 Permit, Section I(A) (Findings 8, 12). Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. *See* 1997 Permit, Provision E(1), Finding 3; 2015 Permit, Section I(A) (Finding 17), Section II(B).

44.     Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i), 1365(f).

**C.     The Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations**

45.     The Storm Water Permit contains certain absolute prohibitions. The Storm Water Permit prohibits the direct or indirect discharge of materials other than stormwater ("non-stormwater discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. 1997 Permit, Discharge Prohibition A(1); 2015 Permit, Discharge Prohibition III(B).

46.     Effluent Limitation (B)(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in stormwater discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biological oxygen demand ("BOD"), TSS, oil and grease ("O&G"), pH, and fecal coliform.

47.     Discharge Prohibition (A)(2) of the 1997 Permit and Discharge Prohibition III(C) of the 2015 Permit prohibits stormwater discharges that cause or threaten to cause pollution, contamination, or nuisance.

48.     Under the CWA and the Storm Water Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate stormwater pollution. 33 U.S.C. § 1311(b); 1997 Permit, Effluent Limitation B(3); 2015 Permit, Effluent Limitation V(A). EPA has developed benchmark levels ("Benchmarks") that are objective guidelines to evaluate whether a permittee's BMPs achieve compliance with the BAT/BCT standards. *See* Final National Pollutant Discharge Elimination System (NPDES) General Permit for Storm Water Discharges From Industrial Activities ("Multi-Sector Permit"), 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); Multi-Sector

1  Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008; Multi-Sector Permit, 65 Fed. Reg. 64,746, 64,766-

2  67 (Oct. 30, 2000).

3       49.     The EPA established Parameter Benchmark Values for the following parameters, among

4  others, are as follows: pH – 6.0 – 9.0 standard units "s.u."); TSS – 100 mg/L; Oil and Grease ("O&G") –

5  15 mg/L; lead ("Pb") – 0.069 mg/L; iron – 1.0 mg/L; nitrate plus nitrite as nitrogen ("N+N") – 0.68

6  mg/L; aluminum ("Al") – 0.75 mg/L; copper ("Cu") – 0.0123 mg/L; and zinc – 0.117 mg/L. The 2015

7  Permit contains Numeric Action Levels ("NALs") for these same parameters that generally mirror the

8  Benchmark Values.

9       50.     The 2015 Permit includes NALs. 2015 Permit, Section I(M) (Finding 62). During the

10  public commenting period, the State Board stated that "NALs are not designed or intended to function as

11  numeric technology-based effluent limitations." State Board 2012 Draft Industrial General Permit

12  Response to Comments, Response #6 to Comment #12; *see also* 2015 Permit Section I(M) (Finding 63).

13      51.     Receiving Water Limitation C(1) of the 1997 Permit and Receiving Water Limitation

14  VI(B) of the 2015 Permit prohibit stormwater discharges from adversely impacting human health or the

15  environment.

16      52.     Discharges with pollutant levels that exceed levels known to adversely impact aquatic

17  species and the environment are violations of the Storm Water Permit's Receiving Water Limitation.

18      53.     Receiving Water Limitation C(2) of the 1997 Permit and Receiving Water Limitation

19  VI(A) of the 2015 Permit prohibit stormwater discharges that cause or contribute to an exceedance of

20  any "applicable Water Quality Standard in a Statewide Water Quality Control Plan or the applicable

21  Regional Board's Basin Plan."

22      54.     Water Quality Standards ("WQS") are pollutant concentration levels determined by the

23  State Board, the various regional boards, and the EPA to be protective of the beneficial uses of the

24  waters that receive polluted discharges.

25      55.     The State of California regulates water quality through the State Board and the nine

26  Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan which contains

27  WQS for water bodies within its geographic area.

28

56.     The State Water Quality Control Board, North Coast Region (May 2011), has issued the Water Quality Control Plan for the North Coast Region ("the Basin Plan") to establish water quality objectives, implementation plans for point and non-point source discharges, prohibitions, and to further statewide plans and policies. The Basin Plan provides that "[t]he pH shall not be depressed below 6.5 nor raised above 8.5." The Basin Plan also provides that "[a]ll waters shall be maintained free of toxic substances in concentrations that are lethal to or that produce other detrimental responses in aquatic organisms." The Basin Plan also establishes that the dissolved oxygen levels of the stretch of the Russian River to which the QST Facility discharges may not be depressed below 7.0 mg/L. Basin Plan, Table 3-1. The Basin Plan sets forth water quality objectives for dissolved metals, such as arsenic, zinc, copper, lead, and mercury. *Id*., Table 3.2. The Basin Plan also states that the waters shall not receive sediment, settleable materials, or suspended materials that cause nuisance or adversely affect the waters' beneficial uses. *Id*.

57.     The Basin Plan also identifies present and potential beneficial uses for the Middle Russian River, including municipal and domestic supply, agricultural supply, industrial service supply, navigation, commercial and sport fishing, warm freshwater habitat, cold freshwater habitat, freshwater replenishment, groundwater recharge, preservation of rare and endangered species, wildlife habitat, aquaculture, spawning reproduction, and/or early development, migration, and contact and non-contact water recreation.

58.     Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plan are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act. According to the 2010 303(d) List of Impaired Water Bodies the Russian River is listed for the following CWA 303(d) impairments: Mercury, Indicator Bacteria, Sedimentation/Siltation, and Temperature.[2] Thus, the receiving waters for pollution from the QST Facility are impaired, and the Defendants' illegal discharges of pollutants above the WQS contributes to the continued impairment of the Russian River's beneficial uses.

---

[2] http://www.waterboards.ca.gov/water_issues/programs/tmdl/2010state_ir_reports/category5_report.shtml (last accessed on January 19, 2017.)

59.     In addition, EPA has promulgated WQS for toxic priority pollutants in all California water bodies ("California Toxics Rule" or "CTR"), which apply to the Receiving Waters, unless expressly superseded by the Basin Plan. 65 Fed. Reg. 31,682 (May 18, 2000); 40 C.F.R. § 131.38.

60.     The CTR sets forth lower numeric limits for zinc and other pollutants; CTR criteria can be as low as 0.067 mg/L for zinc in freshwater surface waters with water hardness calculation of 50 mg/L.[3]

61.     The CTR includes further numeric criteria set to protect human health and the environment in the State of California. *See* Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), available at: http://water.epa.gov/lawsregs/rulesregs/ctr/factsheet.cfm.

62.     Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan, and/or other applicable WQS are violations of Receiving Water Limitation C(2) of the 1997 Permit and Section VI(A) of the 2015 Permit.

**D.     The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements**

63.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. 1997 Permit, Section A(1)(a) and E(2); 2015 Permit, Sections I(I) (Finding 54), X(B). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of stormwater and authorized non-stormwater discharges from the facility. 1997 Permit, Section A(2); 2015 Permit, Section X(G). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of stormwater and authorized non-stormwater discharges from the facility. 1997 Permit, Section A(2); 2015 Permit, Section X(G). The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in stormwater and authorized non-stormwater discharges. 1997 Permit, Section A(2); 2015 Permit, Section X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. 1997 Permit, Order Section A(2); 2015 Permit, Section I(D) (Finding 32), Section X(C).

---

[3] The CTR numeric limits, or "criteria," are expressed as dissolved metal concentrations in the CTR, but the Storm Water Permit required permittees to report their sample results as total metal concentrations. *See* 1997 Permit § B(10)(b); 2015 Permit, Attachment H at 18.

64.    The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the stormwater conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutants control measures; a description of stormwater management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in stormwater discharges and authorized non-stormwater discharges; the identification and elimination of non-stormwater discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and their current responsibilities for developing and implementing the SWPPP. 1997 Permit, Section A(1)-(10); 2015 Permit, Section X.

65.    The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of stormwater discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to stormwater, and to reduce or prevent the discharge of polluted stormwater from industrial facilities. 1997 Permit, Section A(2); 2015 Permit, Section X.

66.    The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. 1997 Permit, Section A(9); 2015 Permit, Section X(A)(9). The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports, and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. 1997 Permit, Sections A(9)(a)-(c); 2015 Permit, Section XV.

67.    Section A(9)(d) of the 1997 Permit requires that the discharger submit an evaluation report that includes an identification of personnel performing the evaluation, the date(s) of the evaluation(s), necessary SWPPP revisions, a schedule for implementing SWPPP revisions, any incidents

of non-compliance and the corrective actions taken, and a certification that the discharger is in compliance with the Storm Water Permit. Storm Water Permit, Section A(9)(d)(i)-(vi). If certification of compliance cannot be provided, the discharger must explain in the evaluation report why the facility is not in compliance with the Storm Water Permit. *Id.*, Section A(9)(d). The evaluation report shall be submitted as part of the Annual Report specified in Section B(14) of the Storm Water Permit. *Id.*

68.    The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. 1997 Permit, Sections A(1), B(3)-(4); 2015 Permit, Sections I(J) (Finding 55), X(B)(1).

### E.    The Storm Water Permit's Monitoring and Reporting Requirements

69.    The 1997 Permit required facility operators to develop and implement a monitoring and reporting plan ("M&RP") when industrial activities begin at a facility. 1997 Permit, Sections B(1)-(2) and E(3). The M&RP must have ensured that stormwater discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the 1997 Permit. *Id.* at Section B(2). The M&RP must have ensured that practices at the facility to prevent or reduce pollutants in stormwater and authorized non-stormwater discharges are evaluated and revised to meet changing conditions at the facility, including revision of the SWPPP. *Id.*

70.    The objectives of the M&RP are to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that stormwater and non-stormwater discharges are in compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 1997 Permit, Sections B(2)(a) and B(2)(b); 2015 Permit, Section XI.

71.    The M&RP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in stormwater discharges. *Id.*, 1997 Permit Section B(2)(c) and B(2)(d).

72.    The 2015 Permit requires facility operators to monitor and sample stormwater discharges to ensure that the facility is complying with the terms of the permit. 2015 Permit, Sections I(J) (Findings 55-56) and XI.

73.    Section B(2)(d) of the 1997 Permit and Section XI(A)(4) of the 2015 Permit require that the M&RP shall be revised as necessary to ensure compliance with the Storm Water Permit.

Complaint for Declaratory and Injunctive Relief      15
and Civil Penalties

74. Section B(4)(a) of the 1997 Permit and Section XI(A) of the 2015 Permit require dischargers to conduct monthly visual observations of stormwater discharges.

75. Section B(4)(c) of the 1997 Permit and Section XI(A)(2) of the 2015 Permit requires dischargers to document the presence of any floating and suspended materials, O&G, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in stormwater discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting stormwater discharges. *See* 1997 Permit, Section B(4)(c); 2015 Permit, Section XI(A)(3). The Storm Water Permit also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. 1997 Permit, Section B(4)(c); 2015 Permit, Section X(B)(1).

76. The Storm Water Permit requires dischargers to visually observe and collect samples of stormwater discharges from all locations where stormwater is discharged. 1997 Permit, Sections B(5) and B(7); 2015 Permit Section XI(B)(4).

77. Section B(5)(a) of the 1997 Permit requires dischargers to collect stormwater samples during the first hour of discharge from the first storm event of the Wet Season and at least one other storm event in the Wet Season. All stormwater discharge locations must be sampled. Facility operators that do not collect samples from the first storm event of the Wet Season are still required to collect samples from two other storm events of the Wet Season and must explain in the Annual Report why the first storm event was not sampled.

78. Section B(5)(b) of the 1997 Permit requires that sampling conducted pursuant to the Storm Water Permit occur during scheduled facility operating hours that are preceded by at least three (3) working days without stormwater discharge.

79. Section B(5)(c)(i) of the 1997 Permit requires dischargers to analyze each sample for pH, specific conductance ("SC"), TSS, and TOC. A discharger may substitute analysis for O&G instead of TOC.

80. Section B(5)(c)(ii) of the 1997 Permit requires dischargers to analyze each sample for toxic chemicals and other pollutants likely to be present in significant quantities in the stormwater discharged from the facility.

81.     Section B(5)(c)(iii) and Table D of the 1997 Permit, require facilities classified as Standard Industrial Classification ("SIC") code 3443, such as the QST Facility, to also analyze stormwater samples for iron ("Fe"), zinc ("Zn"), aluminum ("Al"), and nitrate plus nitrite as nitrogen ("N+N"). 1997 General Permit, Table D; 2015 General Permit Tables 1-2.

82.     Section B(14) of the 1997 Permit requires that dischargers submit an Annual Report to the applicable Regional Board by July 1 of each year. The Annual Report must include a summary of visual observations and sampling results, an evaluation of the visual observations and sampling and analysis results, laboratory reports, the annual comprehensive site compliance evaluation report specified in Section A(9), an explanation of why a facility did not implement any activities required, and the records specified in Section B(13)(i).

83.     Section B(15)(f) of the 1997 Permit requires that sampling and analysis be performed according to Section B of the 1997 Permit.

84.     Section XI(B)(1) of the 2015 Permit requires sampling if a precipitation event produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area ("Qualifying Storm Event" or "QSE").

85.     Section XI(B)(2) of the 2015 Permit requires dischargers to collect and analyze stormwater samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

86.     Section XI(B)(6) of the 2015 Permit requires dischargers to analyze stormwater samples for TSS, O&G, pH, additional parameters identified by the discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs, and additional parameters required by the Regional Water Board.

87.     Table 1 of the 2015 Permit requires Facilities under SIC code 3443, such as the QST Facility, to analyze stormwater samples for iron, nitrate plus nitrite as nitrogen, aluminum, and zinc. 2015 General Permit Tables 1-2.

88.     Section XVI of the 2015 Permit requires dischargers to submit an annual report with a Compliance Checklist that indicates whether a Discharger complies with, and has addressed all

applicable requirements of this General Permit, an explanation for any non-compliance of requirements within the reporting year, as indicated in the Compliance Checklist, an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation.

## V.    STATEMENT OF FACTS

### A.    The QST Facility Site Description

89.    The QST Facility consists of an outdoor welding area, metal parts storage areas, sanding and painting area, a metal saw area, raw materials receiving and storage areas, finished tank storage areas, process pond, and a 55-gallon diesel drum in a concrete dike. The industrial activities of the Facility fall under Standard Industrial Classification ("SIC") Code 3443, Fabricated Plate Work

90.    Industrial operations and activities taking place at the QST Facility include but are not limited to: receiving, handling and transferring of ferrous and non-ferrous metals, tank fabrication including metal cutting, welding, and forming, tank testing and washing. Industrial storage areas include metal parts storage areas, raw materials receiving and storage area, finished tank storage area, process pond and a 55-gallon diesel drum in a concrete dike. Diesel-fueled forklifts and other equipment are powered from a 55-gallon drum at the concrete dike. Vehicle and equipment storage/maintenance areas are located onsite and include forklift greasing and parking. Material handling and processing areas are located onsite including the metal saw area, the tank testing and washing area, and the sanding and painting area. Waste treatment is not present at the site. Disposal areas on site include five scrap metal bins located at various areas onsite along with two dumpsters. Dust or particulate generating areas and activities include, but are not limited to, the outdoor welding area and vehicle traffic in the gravel yard areas.

91.    Industrial materials onsite include, but are not limited to, stainless steel sheet coils and pipes, received in weekly shipment varying in size of delivery from 10,000-50,000 pounds. Six hundred 600,000 pounds of stainless steel are used annually. Mild steel beams and pipes are received monthly with shipment sizes varying from 10,000-50,000 pounds. 70,000 pounds of mild steel are used per year. Welding rods and wire are also an integral part of the industrial operation with 3,600 pounds welding wire and thirty-four (34) pounds of filler rod used annually. 1000 square feet of sandpaper and other

abrasives are used along with 100 cutting discs annually. The QST Facility uses approximately 500 gallons of diesel fuel per year.

92.    The QST Facility collects and discharges polluted storm water associated with industrial activities pursuant to the General Permit through three underground storm drain pipes. The sampling sites for these discharge locations are identified in the SWPPP as W-1, W-2 and W-3. These discharges enter Pruitt Creek, which is a tributary to the Russian River. Pruitt Creek and the Russian River are waters of the United States within the meaning of the CWA. SW-5 is a further sampling site identified in the SWPPP, but sampling has apparently not taken place at SW-5 since 2012. Upon information and belief, there are other locations at the QST Facility discharging stormwater associated with industrial activities, namely from borders and other runoff areas of the QST Facility. These discharges also enter the Pruitt Creek.

93.    Information available to CSPA suggests that the QST Facility discharges quantities of unauthorized non-stormwater. Activities at the QST Facility resulting in unauthorized non-stormwater discharges include but are not limited to, tank washing, vehicle and equipment washing, process cooling water and other process water, replenishing fluid levels and using equipment with hydraulic oil, and cleaning/flushing of storm inlets and drainage pipes.

94.    CSPA is informed and believes, and thereon alleges, that the QST Facility's areas described herein, lack adequate cover or secondary containment, and certain industrial activities occur outside without adequate cover or secondary containment, resulting in discharges of polluted stormwater. Vehicle and other traffic at the QST Facility track dust and particulate matter, increasing the discharge of polluted water, sediments and debris into waters of the United States.

**B.    The Russian River**

95.    The Russian River watershed is approximately 100 miles long and from 12 to 32 miles wide, draining an area of some 1,485 square miles. The headwaters of the Russian River are about 16 miles north of Ukiah. The river flows southward for 90 miles through Redwood, Ukiah, Hopland, and Alexander Valleys, and through the northwestern part of the Santa Rosa Plain, before entering the Pacific Ocean at Jenner.

96.    The Russian River is home to at least two species of salmonids: coho salmon and

chinook. These two species have experienced severe population declines and are listed as threatened under the Endangered Species Act, with coho also listed as "endangered" under the California Endangered Species Act. The Russian River is also home to other species whose populations are threatened, endangered or declining to a level of concern, including but not limited to, freshwater shrimp (Federally Endangered/State Endangered); Western pond turtles (California Species of Concern); western tailed frogs (California Species of Concern); California tiger salamanders (Federally Proposed for Listing/State Species of Concern); and foothill yellow-legged frogs (California Species of Concern). Shrubs, flowering plants, and vines provide sites for nesting shelter and shade for many animals, algae and moss proliferate on rocks and in the water with insects thriving and providing abundant food sources for invertebrates, fish, and birds.

### D.    The QST Facility's Storm Water Permit Coverage

97.    CSPA is informed and believes, and thereon alleges, that the Owners and/or Operators of the QST Facility submitted an NOI for coverage under the 1997 Permit.

98.    CSPA is not currently in possession of any SWPPP's submitted prior to 2015, to cover the QST Facility, but CSPA is informed and believes, and thereon alleges, that the Owners and/or Operators of the QST Facility, submitted an NOI for coverage under the 1997 Permit on November 17, 2014, but should have submitted an NOI for coverage under the 1997 Permit prior to 2014 as industrial operations at the QST Facility required Storm Water Permit coverage from the very outset of industrial operations. Further information about coverage under the 1997 permit will be sought in discovery.

99.    CSPA is informed and believes, and thereon alleges, that the Owners and/or Operators of the QST Facility recently submitted an NOI for their industrial operations on or about June 29, 2015, for coverage for the QST Facility under the 2015 Permit.

100.    The State Board's electronic database, called the Storm Water Multiple Application & Report Tracking System ("SMARTS"), lists the current QST Facility Waste Discharge Identification ("WDID") number as 1 49I025185. SMARTS lists the QST Facility's coverage under the Storm Water Permit as "Active."  The NOI for the QST Facility identify the receiving water for discharges and runoff from the QST Facility to be Pruitt Creek a tributary to the Russian River.

101.    Via search of the SMARTS database, CSPA obtained SWPPPs for the QST Facility dated

June 23, 2015, and an updated SWPPP for the QST Facility dated December 22, 2016 ("QST Facility SWPPP").

102.    CSPA is informed and believes, and thereon alleges, that the QST Facility SWPPP fails to describe and/or adequately describe all of the QST Facility's industrial activities or processes.

103.    CSPA is informed and believes, and thereon alleges, that because the QST Facility's SWPPP fails to describe and/or adequately describe all of the QST Facility's industrial activities, the QST Facility's SWPPP also fails to describe and/or adequately describe all of the significant materials and processes that are related to the QST Facility's industrial activities.

104.    CSPA is informed and believes, and thereon alleges, that pollutants associated with the QST Facility include, but are not limited to: pH-affecting substances; metals, such as iron and aluminum; toxic metals, such as lead, zinc, cadmium, chromium, copper, and mercury; chemical oxygen demand ("COD"); TSS; gasoline and diesel fuels; fugitive metal particulates, and other dust and dirt; and O&G.

105.    CSPA is informed and believes, and thereon alleges, that without properly identifying all industrial activities or all significant materials at the QST Facility in the SWPPP, the Owners and/or Operators have not developed and/or implemented all appropriate BMPs.

106.    CSPA is informed and believes, and thereon alleges, that the QST Facility's SWPPP includes no assessments and/or no adequate assessments of potential pollutant sources, the associated pollutants, and the corresponding BMPs at the QST Facility.

107.    CSPA is informed and believes, and thereon alleges, that the QST Facility's SWPPP includes no description and/or no adequate description of the QST Facility's BMPs, analyses of the effectiveness of the BMPs, or summaries of the BMPs by pollutant source.

108.    CSPA is informed and believes, and thereon alleges, that the Owners and/or Operators have failed and continue to fail to develop the QST Facility's SWPPP and site-specific BMPs consistent with Section A of the 1997 Permit, and Section X of the 2015 Permit.

109.    CSPA is informed and believes, and thereon alleges, that Defendants' SWPPP fails and continues to fail to include an adequate: (1) list of significant materials handled and stored at the site; (2) description of potential pollutant sources including industrial processes, material handling and

stockpiling areas, dust and particulate generating activities; (3) description of significant spills and leaks; or (4) list of all non-stormwater discharges and their sources; Section A of the 1997 Permit and Section X of the 2015 Permit.

110. CSPA is informed and believes, and thereon alleges, that stormwater sampling at the QST Facility demonstrate that the QST Facility's stormwater discharges contain concentrations of pollutants above the Benchmark Levels, including but not limited to aluminum, iron, zinc, nitrate plus nitrite as nitrogen, and TSS.

111. CSPA is informed and believes, and thereon alleges, that the repeated and significant exceedances of Benchmark Levels demonstrate that the QST Facility's Owners and/or Operators have failed and continue to fail to develop and/or implement BMPs to prevent the exposure of pollutants to stormwater and to prevent discharges of polluted stormwater and non-stormwater from the QST Facility.

112. CSPA is informed and believes, and thereon alleges, that the QST Facility Owners and/or Operators have failed and continue to fail to adequately revise the SWPPP, despite repeated and significant concentrations of pollutants in the QST Facility's stormwater discharges, make changes to the QST Facility's training programs, or make any other changes based upon events that would signal a need for required revisions or alteration of practices.

113. CSPA is informed and believes, and thereon alleges, that some of the QST Facility's industrial operations are conducted outdoors without secondary containment or other measures to prevent polluted stormwater from discharging from the QST Facility.

114. CSPA is informed and believes, and thereon alleges, that pollutants, including but not limited to those referenced herein, have been and continue to be tracked throughout the QST Facility's operation areas and offsite.

115. CSPA is informed and believes, and thereon alleges, that these pollutants are deposited into water bodies, and onto streets and/or into storm drains near to the QST Facility via fugitive dust and other means, including but not limited to dust generated by wind, equipment and vehicles.

116. CSPA is informed and believes, and thereon alleges, that trucks and vehicles leaving the QST Facility via staging areas and driveways are pollutant sources tracking sediment, dirt, oil and

grease, metal particulates, and other pollutants off-site.

117.    CSPA is informed and believes, and thereon alleges, that the QST Facility Owners' and/or Operators' failure to properly address pollutant sources and pollutants results in the exposure of pollutants associated with their industrial activities to precipitation, and that this results in discharges of polluted stormwater from the QST Facility and into local waterways in violation of the Storm Water Permit and/or the Clean Water Act.

118.    CSPA is informed and believes, and thereon alleges, that BAT/BCT for the QST Facility is full enclosure of all uncovered bulk material stockpiles, finished product, and industrial operations that cause the spread and release of pollutants, and cleanup of any waste materials, and unused, broken, or legacy equipment at the QST Facility.

119.    CSPA is informed and believes, and thereon alleges, that Defendants have failed to achieve compliance with BAT/BCT requirements by failing to fully enclose bulk material stockpiles, finished products, waste materials, industrial operations that cause the spread and release of pollutants, and unused, broken or legacy equipment.

120.    CSPA is informed and believes, and thereon alleges, that the QST Facility Owners and/or Operators' failure to properly address these pollutants and their sources results in the exposure of pollutants to precipitation, which carries these pollutants with stormwater flows from the QST Facility into Pruitt Creek and then into the Russian River.

121.    CSPA is informed and believes, and thereon alleges, that Defendants' failure to properly address these pollutants and their sources results in the discharge of fugitive dust, including but not limited to dust generated by industrial operations, wind, equipment, and vehicles, which carries these pollutants to off-site waterbodies, and to off-site properties, streets and storm drains adjacent to the QST Facility. Pollutants deposited off-site eventually flow into Pruitt Creek and the Russian River.

### E.    Stormwater Discharges at the QST Facility

122.    The QST Facility Owners and/or Operators report that there are three (3) discharge points at the QST Facility, which accept stormwater flowing in various directions from onsite industrial areas into three discharge locations downstream of the three sampling locations W-1, W-2, and W-3. These discharge locations are drop inlets that connect to three underground drainage pipes that leave the west

side of the QST Facility, near or onto Caletti Avenue. Information available to CSPA suggests that the QST Facility Owners and/or Operators combine samples from the southernmost and the central of the three drain pipes that leave the site (sample locations W-2 and W-3). The rationale for this combined testing is unknown to CSPA. The southernmost drain pipe (just downstream from W-3) drains the shipping and receiving area, raw materials storage area, diesel fueling area, and scrap metal bin area. The central drain pipe (just downstream from W-2) drains the shipping and receiving area, raw materials storage area, and fueling area. The northern most drain pipe (just downstream of W-1) appears to accept stormwater originating from the outdoor welding area, finished tank storage areas, the process pond area, the tank testing and washing area, and the metal parts storage area.

### F. The QST Facility's Stormwater Discharges to the Receiving Waters Contain Elevated Levels of Pollutants

123.    CSPA is informed and believes, and thereon alleges, that pollutants from the QST Facility discharge from multiple discharge points and into Pruitt Creek a tributary to the Russian River.

124.    The EPA promulgated regulations for the Section 402 NPDES permit program defining waters of the United States. *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce. The CWA requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit an NPDES permit application. 40 C.F.R. § 122.21.

125.    CSPA is informed and believes, and thereon alleges, that Pruitt Creek and the Russian River, the Receiving Waters herein, are waters of the United States, and/or a tributary to a traditionally navigable water.

126.    CSPA is informed and believes, and thereon alleges, that polluted stormwater and non-stormwater discharges from the QST Facility to the Receiving Waters.

127.    Stormwater discharges containing pollutants, including but not limited to, heavy metals such as zinc, aluminum, and iron adversely affect the aquatic environment.

128.    Samples of stormwater discharges collected at the QST Facility contain pollutants

including zinc, iron, aluminum, TSS, N+N, and pH affecting substances in excess of levels known to adversely impact aquatic species and the environment, federal regulations, WQS, EPA Benchmarks, and the CTR in violation of the Storm Water Permit's Effluent Limitations and Receiving Water Limitations.

129.    CSPA is informed and believes, and based upon Annual Reports and Monitoring Reports obtained from the Regional Board following service of the Notice Letter herein, that the QST Facility reported multiple effluent exceedances from the 2011-2012, 2014-2015, 2015-2016, and 2016-2017 reporting years, including but not limited to, exceedances of TSS, Al, Fe, pH, N+N and Zn.

130.    CSPA is informed and believes, and thereon alleges, that during and/or after every significant rain event[4] or any other stormwater or non-stormwater discharge that has occurred at the QST Facility since November 21, 2011 through the present, Defendants have discharged and continue to discharge stormwater and non-stormwater from the QST Facility that contains concentrations of pollutants at levels that violate the prohibitions and limitations set forth in the Storm Water Permit, the Federal Effluent Limitations, the EPA Benchmarks, CTR, and the WQS.

**G.    Defendants' Failure to Comply with the Storm Water Permit's Sampling, Reporting, and Monitoring Requirements**

131.    CSPA is informed and believes, and thereon alleges, that Defendants failed and continue to fail to develop an adequate M&RP for industrial operations at the QST Facility that complies with Section B of the 1997 Permit, and Section XI of the 2105 Permit.

132.    CSPA is informed and believes, and thereon alleges, that Defendants failed and continue to fail to revise the M&RP for the QST Facility as necessary to ensure compliance with the 1997 Permit, in violation of Section B(2)(d), and Section XI of the 2105 Permit.

133.    CSPA is informed and believes, and thereon alleges, that Defendants have failed and continue to fail to collect samples during the first hour of the first storm event of the Wet Season over the past five years, in violation of Section B(5)(a) of the 1997 Permit and Section XI(B) of the 2015 Permit.

134.    CSPA is informed and believes, and thereon alleges, that Defendants failed and continue

---

[4] A significant rain event is an event that produces stormwater runoff, which according to EPA occurs with more than 0.1 inches of precipitation.

to fail to analyze stormwater samples collected at the QST Facility for all toxic chemicals and other pollutants likely to be present in significant quantities in the stormwater discharges, in violation of Section B(5) of the 1997 Permit and Section XI(B) of the 2015 Permit.

135. CSPA is informed and believes, and thereon alleges, that Defendants have failed and continue to fail to demonstrate that stormwater sampling limited to those listed in the QST Facility's 2016 SWPPP, are representative of pollutants from the QST Facility, in violation of Section B(5) of the 1997 Permit and Section XI(B) of the 2015 Permit.

136. CSPA is informed and believes, and thereon alleges, that Defendants have failed and continue to fail to sample stormwater discharges from all discharge locations, in violation of Section B(7) of the 1997 Permit and Sections XI(B) and XI(C) of the 2015 Permit.

137. CSPA is informed and believes, and thereon alleges, that Defendants failed and continue to fail to adequately revise the M&RP for the QST Facility as necessary to ensure compliance with the Storm Water Permit in violation of Sections A(9) and A(10) of 1997 Permit and Sections XI(B) and XI(C) of the 2015 Permit.

138. CSPA is informed and believes, and thereon alleges, that the Owners and/or Operators of the QST Facility consistently fail to perform visual observations of stormwater during QSEs.

139. CSPA is informed and believes, and thereon alleges, that the Owners and/or Operators of the QST Facility have consistently failed and continue to fail to report any noncompliance with the Storm Water Permit at the time that the Annual Report is submitted, including: 1) a description of the noncompliance and its cause, 2) the period of noncompliance, 3) if the noncompliance has not been corrected, the anticipated time it is expected to continue, and 4) steps taken or planned to reduce and prevent recurrence of the noncompliance as required by the 1997 Permit, Section C(11)(d).

140. CSPA is informed and believes, and thereon alleges, that Defendants' certifications of compliance with the 1997 Permit in each of its past five (5) Annual Reports, provided the Annual Reports were in fact submitted, were erroneous because Defendants have not developed and/or implemented the required BMPs, or revised the SWPPP or the M&RP, as required by Sections A and B of the 1997 Permit.

141. CSPA is informed and believes, and thereon alleges, that Defendants have failed to

submit complete Annual Reports to the Regional Board in violation of Section B(14) of the 1997 Permit.

## VI.     CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Discharges of Contaminated Stormwater in Violation of
the Storm Water Permit's Effluent Limitations and the Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

142.     CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

143.     CSPA is informed and believes, and thereon alleges, that Defendants failed and continue to fail to reduce or prevent pollutants associated with industrial activities at the QST Facility from stormwater discharges from the QST Facility through implementation of BMPs that achieve BAT/BCT.

144.     CSPA is informed and believes, and thereon alleges, that discharges of stormwater containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the QST Facility occur every time stormwater discharges from the QST Facility. Defendants' failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the QST Facility is a violation of the Storm Water Permit and the CWA. *See* 1997 Permit, Effluent Limitation B(3); 2015 Permit, Section I(D) (Finding 32), Effluent Limitation V(A); 33 U.S.C. § 1311(b).

145.     The Owners and/or Operators and Defendants violate and will continue to violate the Storm Water Permit's Effluent Limitations each and every time stormwater containing levels of pollutants that do not achieve BAT/BCT standards discharges from the QST Facility.

146.     CSPA is informed and believes, and thereon alleges, that Defendants' violations of Effluent Limitations of the Storm Water Permit and the Clean Water Act are ongoing and continuous.

147.     Each day since at least November 21, 2011 that Defendants and the Owners and/or Operators discharge stormwater containing pollutants in violation of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

148.     By committing the acts and omissions alleged above, the Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from November 21, 2011 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

149.    An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm CSPA has no plain, speedy, or adequate remedy at law.

150.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

**SECOND CAUSE OF ACTION**
**Defendants' Discharges of Contaminated Stormwater in Violation of**
**the Storm Water Permit's Receiving Water Limitations and the Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

151.    CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

152.    CSPA is informed and believes, and thereon alleges, that discharges of stormwater containing levels of pollutants that adversely impact human health and/or the environment from the QST Facility occur each time stormwater discharges from the QST Facility.

153.    CSPA is informed and believes, and thereon alleges, that stormwater containing levels of pollutants that cause or contribute to exceedances of water quality standards has discharged and continues to discharge from the QST Facility each time stormwater discharges from the QST Facility.

154.    The Defendants and Owners and/or Operators violate and will continue to violate the Storm Water Permit's Receiving Water Limitations each and every time stormwater containing levels of pollutants that adversely impact human health and/or the environment, and that cause or contribute to exceedances of WQS, discharges from the QST Facility.

155.    CSPA is informed and believes, and thereon alleges, that the Defendants' and Owners' and/or Operators' violations of Receiving Water Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

156.    Each and every violation of the Storm Water Permits' Receiving Water Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

157.   By committing the acts and omissions alleged above, Defendants and the QST Facility Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from November 21, 2011 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

158.   An action for injunctive relief under the Clean Water Act is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

159.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

### THIRD CAUSE OF ACTION
**Defendants' Discharges of Non-Stormwater in Violation<br>of the Storm Water and the Clean Water Act.<br>33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

160.   CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

161.   CSPA is informed and believes, and thereon alleges, that prohibited non-stormwater discharges have discharged and continue to discharge from the Facilities, in violation of the Storm Water Permit and/or CWA Section 301(a), 33 U.S.C. § 1311(a).

162.   CSPA is informed and believes, and thereon alleges, that Defendants and the Owners' and/or Operators' violations of Discharge Prohibitions of the Storm Water Permit are ongoing and continuous.

163.   Each and every violation of the Storm Water Permit's Discharge Prohibitions is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

164.   By committing the acts and omissions alleged above, the Defendants and the QST Facility Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from November 21, 2011 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

165.    An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

166.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

**FOURTH CAUSE OF ACTION**
**Defendants' Failure to Adequately Develop, Implement, and/or**
**Revise a Storm Water Pollutant Prevention Plan in Violation of the**
**Storm Water Permit and the Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

167.    CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

168.    CSPA is informed and believes, and thereon alleges, that Defendants and the Owners and/or Operators have failed and continue to fail to develop adequate SWPPPs for the QST Facility, in violation of the Storm Water Permit.

169.    CSPA is informed and believes, and thereon alleges, that Defendants and the Owners and/or Operators have failed and continue to fail to adequately implement SWPPPs for the QST Facility, in violation of the Storm Water Permit.

170.    CSPA is informed and believes, and thereon alleges, that Defendants and the Owners and/or Operators have failed and continue to fail to adequately revise the SWPPP for the QST Facility, in violation of the Storm Water Permit.

171.    The Owners and/or Operators have been in violation of the Storm Water Permit at the QST Facility every day from November 21, 2011 to the present.

172.    Defendants and the Owners' and/or Operators' violations of the Storm Water Permit and the CWA at the QST Facility are ongoing and continuous.

173.    Defendants and the Owners and/or Operators will continue to be in violation of the Storm Water Permit and the CWA each and every day Defendants and the Owners and/or Operators fail to

1    adequately develop, implement, and/or revise the SWPPP for the QST Facility.

2    174.    Each and every violation of the Storm Water Permit's SWPPP requirements at the QST

3    Facility is a separate and distinct violation of the CWA.

4    175.    By committing the acts and omissions alleged above, Defendants and the Owners and/or

5    Operators are subject to an assessment of civil penalties for each and every violation of the CWA

6    occurring from November 21, 2011 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33

7    U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

8    176.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the

9    CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would

10   irreparably harm CSPA, its members, and the citizens of the State of California, for which harm they

11   have no plain, speedy, or adequate remedy at law.

12   177.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual

13   controversy exists as to the rights and other legal relations of the Parties.

14   WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

### FIFTH CAUSE OF ACTION
**Defendants' Failure to Adequately Develop, Implement, and/or**
**Revise a Monitoring and Reporting Plan in Violation of**
**the Storm Water Permit and the Clean Water Act.**
**U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

18   178.    CSPA incorporates the allegations contained in the above paragraphs as though fully set

19   forth herein.

20   179.    CSPA is informed and believes, and thereon alleges, that Defendants and the Owners

21   and/or Operators have failed and continue to fail to develop an adequate M&RP for the QST Facility, in

22   violation of the Storm Water Permit.

23   180.    CSPA is informed and believes, and thereon alleges, that Defendants and the Owners

24   and/or Operators have failed and continue to fail to adequately implement an M&RP for the QST

25   Facility, in violation of the Storm Water Permit.

26   181.    CSPA is informed and believes, and thereon alleges, that Defendants and the Owners

27   and/or Operators have failed and continue to fail to adequately revise an M&RP for the QST Facility, in

28   violation of the Storm Water Permit.

182. Defendants and the Owners and/or Operators have been in violation of the Storm Water Permit's monitoring requirements at the QST Facility every day from November 21, 2011 to the present.

183. Defendants and the Owners' and/or Operators' violations of their Storm Water Permit's monitoring requirements and the CWA at the QST Facility are ongoing and continuous.

184. Defendants and the Owners and/or Operators will continue to be in violation of Section B and Provision E(3) the 1997 Permit, Section XI of the 2015 Permit, and the CWA each and every day they fail to adequately develop, implement, and/or revise an M&RP for the Facilities.

185. Each and every violation of the Storm Water Permit's M&RP requirements at the QST Facility is a separate and distinct violation of the CWA.

186. By committing the acts and omissions alleged above, Defendants and the Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from November 21, 2011 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

187. An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm CSPA, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

188. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

**SIXTH CAUSE OF ACTION**
**Defendants' Failure to Report as Required by the Storm Water**
**Permit in Violation of the Storm Water Permit and the**
**Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

189. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

190. Receiving Water Limitation C(3) of the 1997 Permit requires a discharger to prepare and submit a report to the Regional Board describing changes it will make to current BMPs in order to

prevent or reduce any pollutant in stormwater discharges that is causing or contributing to an exceedance of water quality standards. Once approved by the Regional Board, those BMPs must be implemented into a Facility's SWPPP.

191.    Receiving Water Limitation C(4)(a) of the 1997 Permit requires the report to be submitted to the Regional Board no later than 60-days from the date the discharger first learns its discharge is causing or contributing to an exceedance of an applicable water quality standard. Section C(11)(d) of the Permit's Standard Provisions also requires dischargers to report any noncompliance.

192.    CSPA is informed and believes, and thereon alleges, that Defendant and the Owners and/or Operators have failed and continue to fail to submit accurate Annual Reports to the Regional Board, in violation of Sections B(14), C(9), and C(10) of the 1997 Permit.

193.    CSPA is informed and believes, and thereon alleges, that Defendants and the Owners' and/or Operators' Annual Reports for the QST Facility failed and continue to fail to meet the monitoring and reporting requirements of the Storm Water Permit, in violation of Section B(14) of the 1997 Permit.

194.    CSPA is informed and believes, and thereon alleges, that Defendants and the Owners and/or Operators have failed and continue to fail to submit complete Annual Reports for the QST Facility to the Regional Board, in violation of Sections B(14), C(9), C(10) and C(11) of the 1997 Permit.

195.    Defendants and the Owners and/or Operators have been in violation of Sections B(14), C(9), C(10), and/or C(11) of the 1997 Permit and CWA every day since at least November 21, 2011.

196.    Defendants and the Owners and/or Operators have been in violation of the reporting requirements of the Storm Water Permit each day it has operated the QST Facility without reporting as required by Receiving Water Limitations C(3) and C(4) of the 1997 Permit.

197.    Defendants and the Owners and/or Operators have been in violation of Receiving Water Limitations C(3) and C(4) of the Storm Water Permit every day since at least November 21, 2011.

198.    Defendants' and the Owners' and/or Operators' violations of the reporting requirements of the Storm Water Permit and the CWA are ongoing and continuous.

199.    By committing the acts and omissions alleged above, Defendants and the Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA

occurring from November 21, 2011 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

200.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm CSPA, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

201.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

## VII.    RELIEF REQUESTED

202.    Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.    A Court order declaring Defendants to have violated and to be in violation of Sections 301(a) and (b) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b); for its unlawful discharges of pollutants from the QST Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent benchmarks, standards, or limitations which include BAT/BCT requirements, and for failing to comply with the substantive and procedural requirements of the Storm Water Permit and the CWA.

b.    A Court order enjoining Defendants from violating the substantive and procedural requirements of the Storm Water Permit and Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342;

c.    A Court order assessing civil monetary penalties for each violation of the CWA at $37,500 per day per violation for violations occurring since November 21, 2011, as permitted by 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2009);

d.    A Court order awarding Plaintiff its reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

e.    Any other relief as this Court may deem appropriate.

Dated: January 23, 2017                         Respectfully submitted,

_____
Anthony M. Barnes
AQUA TERRA AERIS LAW GROUP
Attorneys for Plaintiff
CALIFORNIA SPORTFISHING PROTECTION ALLIANCE