# EXHIBIT A

Anthony Barnes (Bar No. 199048)
Jason Flanders (Bar No. 238007)
AQUA TERRA AERIS LAW GROUP LLP
828 San Pablo Ave., Ste. 115B
Albany, CA 94706
Phone: (415) 326-3173
Email: amb@atalawgroup.com

*Attorneys for Plaintiff*
CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation, | **Civil Case 3:17-cv-00321-EMC** |
| Plaintiff, | **[Proposed] CONSENT DECREE** |
| v. | |
| RICHARD DAPELO, individually, and doing business as QUALITY STAINLESS TANKS, and QUALITY STAINLESS TANKS, an entity of unknown type, | **(Federal Water Pollution Control Act, 33 U.S.C. §1251 et seq.)** |
| Defendants. | |

## CONSENT DECREE

The following Consent Decree is entered into by and between Plaintiff California Sportfishing Protection Alliance, a non-profit corporation, and Defendant Richard Dapelo, individually and doing business as Quality Stainless Tanks. The entities entering into this Consent Decree are collectively referred to as "the Parties."[1]

**WHEREAS**, California Sportfishing Protection Alliance ("Plaintiff") is a non-profit corporation organized under the laws of the State of California, dedicated to the protection, enhancement, and restoration of the Russian River, its tributaries, and other California waters.

**WHEREAS**, Defendant Richard Dapelo, doing business as Quality Stainless Tanks

---

[1] The putative defendant, Quality Stainless Tanks, an entity of unknown type, has been dismissed herein. Docket No. 29.

("Defendant"), is an individual citizen of the State of California.

**WHEREAS**, Defendant owns and operates a stainless-steel tank manufacturing operation facility in Windsor, California, located at 510 Caletti Ave, Windsor, CA ("the Facility") with the Waste Discharge Identification ("WDID") number of 1 49I025185 and Standard Industrial Classification ("SIC") Code 3443, Fabricated Plate Work.

**WHEREAS**, stormwater discharges associated with industrial activity at the Facility are regulated pursuant to the National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001 [State Water Resources Control Board], Water Quality Order No. 2014-57-DWQ ("Storm Water Permit"), and the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq. ("Clean Water Act" or "CWA"), Sections 301(a) and 402, 33 U.S.C. §§ 1311(a), 1342.

**WHEREAS**, Plaintiff contends that Defendant's operations at the Facility result in discharges into an underground shared storm drain system that flows through stormwater conveyance channels and enters Pruitt Creek, a tributary to the Russian River, and contends that those discharges are regulated by the Clean Water Act, Sections 301(a) and 402, 33 U.S.C. §§ 1311(a), 1342 (a map of the Facility is attached hereto as **Exhibit A** and incorporated herein by reference);

**WHEREAS**, on November 21, 2016, Plaintiff served Defendant, the Administrator of the U.S. Environmental Protection Agency ("EPA"), the Executive Director of the State Water Resources Control Board ("State Board"), the Executive Officer of the North Coast Regional Water Quality Control Board, ("Regional Board"), and the Regional Administrator of EPA Region IX, with a notice of intent to file suit ("60-Day Notice") under Section 505(b)(1)(a) of the of the Clean Water Act, 33 U.S.C. § 1365(b)(1)(A), alleging violations of the Clean Water Act and the Storm Water Permit and its previous version, Water Quality Order No. 92-12-DWQ (as amended by Water Quality Order 97-03-DWQ), at the Facility (a true and correct copy of Plaintiff's 60-Day Notice is attached as **Exhibit B** and incorporated herein by reference);

**WHEREAS**, on January 23, 2017, Plaintiff filed a complaint against Defendant alleging Defendant is in violation of the substantive and procedural requirements of the Storm Water Permit and the Clean Water Act;

**WHEREAS**, Defendant denies all allegations and claims contained in the 60-Day Notice and the Complaint and reserves all rights and defenses with respect to such allegations and claims;

**WHEREAS**, the Parties have agreed that it is in their mutual interest and therefore choose to resolve in full Plaintiff's allegations in the 60-Day Notice and Complaint through settlement and avoid the cost and uncertainties of further litigation;

**NOW THEREFORE IT IS HEREBY STIPULATED BETWEEN THE PARTIES, AND ORDERED AND DECREED BY THE COURT, AS FOLLOWS:**

1. For the purposes of this Consent Decree, the Parties agree: A) the Court has jurisdiction over the subject matter of this action pursuant to Section 505(a)(1)(A) of the Clean Water Act, 33 U.S.C. § 1365(a)(1)(A);  B) venue is appropriate in the United States District Court for the Northern District of California pursuant to Section 505(c)(1) of the Clean Water Act, 33 U.S.C. § 1365(c)(1), because the Facility at which the alleged violations took place is located within this District; C) the Complaint states claims upon which relief may be granted against Defendant pursuant to Section 505 of the Clean Water Act, 33 U.S.C. § 1365; D) Plaintiff has standing to bring this action; and E) the Court shall retain jurisdiction over this matter for purposes of interpreting, modifying, or enforcing the terms of this Consent Decree for the life of the Consent Decree, or as long thereafter as is necessary for the Court to resolve any motion to enforce this Consent Decree.

**OBJECTIVES**

2. **Compliance with General Permit and Clean Water Act:** It is the express purpose of the Parties entering into this Consent Decree that throughout the Term of this Consent Decree, which is defined below in Paragraph 4, Defendant shall commence all measures needed to operate the Facility in full compliance with applicable requirements of the Storm Water Permit, and the Clean Water Act, subject to any defenses available under the law. All actions taken by Defendant pursuant to this Consent Decree shall be made in compliance with all applicable Federal and State laws and local rules and regulations.

**EFFECTIVE DATE, AND TERM OF CONSENT DECREE**

3. **Effective Date and Dismissal:** Within ten (10) days of expiration of the Federal Agencies' statutory review period, or the earlier receipt of non-objection from the United States Department of

Justice, the Parties shall file with the Court a Stipulation and Proposed Order that shall provide that the Complaint and all claims therein shall be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2). The Proposed Order shall provide for the District Court to retain jurisdiction for the enforcement of this Consent Decree as provided herein. The date of entry of the Order shall be the "Effective Date" of this Consent Decree.

**4.   Term:** The Term of this Consent Decree shall run from the Effective Date until September 1, 2019, unless an Action Plan is required per Paragraphs 5 and 12, below, based on the 2018-2019 reporting year[2], in which case the Consent Decree will terminate upon complete implementation of the measures described in the Action Plan.

**COMMITMENTS OF DEFENDANT**

**5.   BAT/BCT and Benchmark-Based Limits.** After October 1, 2017, and for the remainder of the Term of this Consent Decree, the Action Plan requirements of Paragraph 14 shall be triggered if there is an "Exceedance." An Exceedance as defined under this Consent Decree only occurs if two (2) storm water sampling results for any given sampling Parameter identified in Table 1 exceed the Limit for that parameter in a single reporting year.

### Table 1: Limits for Storm Water Discharges

| Parameter (All metals are total recoverable) | Limit (all but pH in mg/L) | Test Method[3] |
|---|---|---|
| Total Suspended Solids | 100 mg/L | SM 2540-D(NAL) |
| Zinc | 0.26 mg/L | EPA 200.8 |
| Aluminum | 0.75 mg/L | EPA 200.8 |
| Iron | 1 mg/L | EPA 200.7 |
| Nitrate + Nitrite Nitrogen | 0.68 mg/L | SM 4500-NO3- E |
| Oil & Grease | 15 mg/L | EPA 1664A |
| pH | 6.0-9.0 s.u. | See Section XI.C.2 of the General Permit |

**6.   Best Management Practices ( "BMPs"):** In addition to maintaining the current BMPs at the Facility, within forty-five (45) days of the Effective Date, unless otherwise noted, Defendant shall

---

[2] A reporting year is July 1 to June 30.
[3] Test Methods from Table 2 of the 2014 General Permit.

implement or continue to implement the BMPs identified herein, as well as any other BMPs necessary to comply with the provisions of the Consent Decree, the Storm Water Permit and the Clean Water Act, with the objective of preventing and/or reducing contamination in stormwater discharges from the Facility consistent with the use of the BAT and the BCT and in compliance with applicable water quality standards.

**6.1**     Defendant has installed and shall install curbed berms designed and implemented to prevent any untreated run-on of fugitive stormwater onto the Facility from the adjacent industrial facilities.

**6.2**     Defendant shall install stormwater filter media inserts into all drop inlets ("DIs") at the Facility that receive runoff from industrial activities at the Facility W-2, W-3, and W-4 (see **Exhibit A**), in order to treat stormwater for observed pollutants at the Facility, and that allow for stormwater sampling after filtration but before entering the shared storm drain system at the Facility.  Replacement of filter media in DIs shall be implemented on a regular schedule in accordance with the useful lifespan of the filter media product(s), requiring replacement, at a minimum, at the midpoint of the Wet Season (on or about January 31), and again prior to the start of the subsequent Wet Season.

**6.3**     During the Wet Season, Defendant shall fit and install Filtrexx Envirosoxx®, or equivalent media-filled fiber roll wattles designed to remove metals from stormwater, around the following DIs (i.e., sampling points) at the Facility: W-1, W-2, W-3, and W-4 (see **Exhibit A**). All Filtrexx fiber roll wattles shall be weighed down with sandbags during rain events to increase the surface and filter area of the fiber roll wattles. Replacement of all Filtrexx Envirosoxx, or equivalent media-filled fiber roll wattles designed to remove metals from stormwater, shall be implemented on a regular schedule in accordance with the useful lifespan of the product(s), requiring replacement per manufactures recommendations, but at a minimum prior to the start of each Wet Season. Defendant shall place and maintain sandbags around other DIs at the Facility.

**6.4**     Defendant shall implement more robust housekeeping measures, including, but not limited to, a program of sweeping all paved areas of the Facility. The sweeping program shall apply to all areas that discharge to sampling points, and will include (a) weekly sweeping of all

paved surfaces during the Wet Season (October 1 – May 31), (b) monthly sweeping during the rest of the year, and (c) vacuuming monthly and as needed. To document compliance with this Paragraph, Defendant shall institute an established sweeping route with a map, a schedule and a log for the sweeping program. Plaintiff shall have the right to inspect documentation related to sweeping during site inspections, and Defendant shall provide the documentation related to sweeping to Plaintiff with the Facility's Annual Reports[4] at the time Annual Reports are submitted to the Regional Board.

**6.5**      Defendant shall not conduct metal grinding, cutting and sanding at the Facility except under structural cover.

**6.6**      Defendant shall provide cover to all raw material and metal part storage areas at the Facility, with the exception of clean stainless steel.

**6.7**      Defendant shall move all unused equipment stored outside under structural cover, or implement and maintain a system for continuous tarping and/or cover of all surplus equipment stored outside at the Facility, using durable cover impervious to water, to cover the equipment. The cover shall be implemented to prevent storm water from coming in contact with the equipment. Unused equipment means equipment not in regular use at the Facility for more than thirty (30) consecutive days at a time.

**6.8**      Defendant shall cover all open bins and containers to prevent open bins or containers containing industrial materials or wastes from industrial activities from coming into contact with rainfall or stormwater runoff, at the Facility. Any bins or containers stored outside shall either be covered or shall be empty and clean. A supervisor shall inspect the entirety of the Facility each business day during the Wet Season, and shall take all reasonable steps to ensure that all bins or containers have lids or covers and, prior to any rain event, are closed or covered.

**6.9**      All maintenance, repair, and replacement activities relating to stormwater BMPs contained in this Consent Decree shall be recorded and described in appropriate written records. Such records shall include, but not be limited to, any maintenance activities and any replacement

---

[4] The Storm Water Permit requires dischargers to submit Annual Reports no later than July 15th following each reporting year.

of any stormwater impoundment or collection equipment and media-filled fiber roll wattles, DI filter media inserts, and drains. The written records for each Wet Season shall be kept with the written records required by the Facility's Stormwater Pollution Prevention Plan ("SWPPP") and shall be provided to Plaintiff with the Facility's Annual Report at the time the Annual Report is submitted to the Regional Board.

7.   Defendant shall not unilaterally abandon or significantly modify any of the BMPs described above without prior consultation with Plaintiff. Defendant's failure to consult with Plaintiff prior to abandoning or significantly modifying a BMP, implementation, as described herein, shall constitute a breach of this Consent Decree. Following notice of Defendant's planned abandonment or significant modification as described in this Paragraph, Plaintiff shall provide comments, if any, to Defendant within seven (7) days of the notice. Any failure to comment on the proposed modifications by Plaintiff shall not be deemed to constitute agreement with the proposals or be deemed to construe a waiver of any of Plaintiff's rights or remedies under this Consent Decree. Consultation pursuant to this Paragraph shall not constitute an Action Plan as described in Paragraph 14 of this Consent Decree, or be deemed to waive any of Defendant's obligations with respect to an Action Plan.

8.   **Visual Observations.** During the life of this Consent Decree, Defendant shall conduct visual observations at each discharge location during each Qualifying Storm Event ("QSE")[5] that occurs during a reporting period (July 1 to December 31, January 1 to June 30), until the Defendant meets the sampling frequency requirements in Paragraph 12. Defendant shall continue to conduct monthly visual observations and maintain logs as required by the Storm Water Permit.

9.   **Employee Training Program.** Defendant shall continue to develop and implement Defendant's employee training and reporting program and include: (1) Semi-annual meetings of the Storm Water Pollution Prevention Team ("SWPPP Team"), held between September 10 and the start of a Wet Season (October 1), and again within the month of February,  to ensure effective stormwater training prior to the start, and at the midpoint, of a Wet Season, and to ensure that visual monitoring is properly conducted and reported  (in the Annual Report); (2) Training all SWPPP Team employees as to the BMPs (as

---

[5] "Qualifying Storm Events" under the Storm Water Permit is any precipitation event that: (a) Produces a discharge for at least one drainage area; and, (b) Is preceded by 48 hours with no discharge from any drainage area.

described in Paragraph 6) and the Facility's SWPPP to ensure that BMPs are implemented effectively and on schedule and that structural BMPs are maintained properly; (3) Training individual employees as to their specific responsibilities as to BMPs; (4) Training including proper handling (collection, storage and disposal) of all potential pollutant sources at the Facility; and (5) Training all employees as to the Storm Water Permit's prohibition of non-stormwater discharges, identifying non-stormwater discharges, and that non-stormwater discharges can result from improper surface washing or incomplete dust control methods, and how to detect and prevent non-stormwater discharges.

**10. Storm Water Pollution Prevention Plan ("SWPPP").** Within thirty (30) days of the Effective Date, Defendant shall amend the Facility's SWPPP to incorporate the requirements and BMPs set forth in Section X of the Storm Water Permit and Paragraphs 6.1 through 6.9 of this Consent Decree, and submit the amended SWPPP to Plaintiff within ten (10) business days thereafter. Plaintiff shall have fourteen (14) days from receipt of an amended SWPPP to propose any changes. Within thirty (30) days of notification by Plaintiff of any proposed changes to the amended SWPPP, Defendant shall either make such changes to the amended SWPPP, or shall justify to Plaintiff in writing why any proposed change is not made. Compliance with the SWPPP, as amended in accordance with this Paragraph, shall, at all times, be a requirement of this Consent Decree. Following the submittal of the amended SWPPP, Defendant shall revise the Facility's SWPPP if there is any abandonment or significant changes in the Facility's operations, including, but not limited to, changes to stormwater discharge points or BMPs. Such further SWPPP revisions shall occur within thirty (30) days of abandonment or significant changes in operations.

**11. Future Storm Water Pollution Prevention Plan Amendments.** Defendant shall provide Plaintiff with a copy of any amendments to the Facility's SWPPP, or a link to the revisions on the State Board's SMARTS system made during the Term of the Consent Decree, within ten (10) days of submitting such amendments to the Regional Board.

**12. Sampling Frequency.** For the 2017-2018 and 2018-2019 reporting years (October 1, 2017 to June 30, 2018, and October 1, 2018 to June 30, 2019), Defendant shall collect and analyze samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31) and two (2) QSEs within the second half of each reporting year (January 1 to June 30), at the Facility, from all sampling

points identified in the Facility's SWPPP. If Defendant receives stormwater sampling data

demonstrating an Exceedance (as defined in Paragraph 5) during the term of this Consent Decree,

Defendant shall provide Plaintiff with an Action Plan in compliance with the "Action Plan"

requirements set forth below in Paragraph 14.

**13. Sampling Parameters.** Each of the stormwater samples collected pursuant to Paragraph 12

herein shall be analyzed for each of the Parameters listed in Table 1 using the associated Test Method

listed in Table 1. The stormwater analysis shall be done by a laboratory accredited by the State of

California. Samples collected from the Facility shall be delivered to the laboratory as soon as possible

after collection to ensure that sample "hold time" is not exceeded. Pursuant to the Notice provisions of

Paragraph 39 herein, Defendant shall provide sampling results to Plaintiff within seven (7) days of

receiving a validated laboratory report, from each sampling event under this Consent Decree.

**14. Action Plan.** Defendant agrees to submit an Action Plan: (1) if required pursuant to Paragraphs 5

and 12, or (2) if Defendant fails to collect and analyze samples from the number of QSEs required in

Paragraph 12 above, or (3) if Defendant fails to comply with any other requirements of the Storm Water

Permit. The Action Plan shall comply with the following requirements: Defendant shall prepare a

detailed, written statement discussing and describing the Exceedance(s) or failure to collect and analyze

samples from the required number of QSEs, the possible cause(s) and/or source of the Exceedance(s) or

failure(s), additional measures or BMPs designed to address and eliminate future Exceedance(s) or

failure(s), and an expeditious time line for implementing the additional measures or BMPs (collectively,

the "Action Plan"). Defendant shall provide the Action Plan to Plaintiff no later than thirty (30) days

after Defendant receives the sampling results that complete Defendant's obligation under Paragraph 12

for the reporting year, or fails to sample the required number of QSEs at the close of any reporting year.

In no event shall the Action Plan be submitted later than July 31st of each reporting year under this

Consent Decree, and in no event shall more than one Action Plan per reporting year be required.

**15. Additional Measures.** Such additional measures or BMPs under an Action Plan, to the extent

reasonably feasible, shall be implemented within sixty (60) days after the due date of the Action Plan.

Within thirty (30) days of implementation, Defendant shall amend the Facility's SWPPP to describe all

additional measures or BMPs in the Action Plan.

**16. Plaintiff Review of Action Plan(s).** Plaintiff may review and comment on an Action Plan and suggest any additional pollution prevention measures or BMPs it believes are appropriate within thirty (30) days of receipt of any Action Plan under this Consent Decree; however, Plaintiff's failure to do so shall not be deemed to constitute agreement with the additional measures or BMPs proposed by Defendant. Defendant shall not be obligated to perform any of the pollution prevention measures or BMPs Plaintiff may recommend (subject to dispute resolution in Paragraphs 22 and 23), but Defendant shall give good faith consideration to Plaintiff's suggested additional measures or BMPs, and provide a written explanation as to why Defendant declines to implement the suggested additional measures or BMPs. Upon request by Plaintiff, Defendant agrees to meet and confer in good faith (at the Facility, if requested by Plaintiff) regarding the contents and sufficiency of the Action Plan.

**17. Site Inspections.** In addition to any site inspections conducted as part of the settlement process and the meet-and-confer process concerning an Action Plan as set forth above, Defendant shall permit representatives of Plaintiff to perform up to two (2) physical inspections at the Facility during the term of this Agreement, upon notice as provided in paragraph 39. These inspections shall not last longer than three (3) hours, and may be performed by Plaintiff's counsel and consultants and may include sampling, photographing, and/or videotaping. All sampling shall be (a) conducted by a qualified sampler at the sampling points indicated in the SWPPP, (b) in accordance with monitoring required by the SWPPP, and (c) include providing both Plaintiff and Defendant split samples at the time of sampling. Samples collected by Plaintiff shall not be considered samples collected for the purposes of compliance with the General Permit sampling requirements, and shall not be uploaded to SMARTS.

**17.1    Confidentiality of Sampling Results.** The results of Plaintiff's sampling shall be kept confidential to the extent allowable by law, except for the purposes of dispute resolution. Plaintiff and Defendant acknowledge that in certain circumstances disclosure may be compelled by law because of the actions of third parties. (For example, a third-party litigant could seek to compel disclosure through discovery.) In the event such a requirement to disclose arises, Plaintiff shall provide Defendant with notice pursuant to Paragraph 39 of such a requirement within five (5) days. The Parties acknowledge that Defendant may seek to intervene in order to block or limit Plaintiff's

disclosure to a third party.  If Defendant decides in its discretion to intervene, such intervention shall not be construed as Plaintiff's support of Defendant's action.

**17.2**        **Sampling Results.** Plaintiff shall provide Defendant with a copy of all sampling reports, photographs and/or video within a reasonable time after the site inspection, not to exceed fourteen (14) days after Plaintiff's receipt of any sampling reports from split samples, and seven (7) days after the site inspection, for photographs and/or video.

**17.3**        **Notice and Timing of Inspection.** Plaintiff shall provide at least four (4) calendar days' advance notice of such physical inspection and the names and contact information of Plaintiff's representatives. Defendant shall have the right to deny access if circumstances would make the inspection unduly burdensome or pose significant interference with business operations or involve the safety of individuals. In such case, Defendant shall specify at least three (3) dates within the two (2) weeks thereafter upon which a physical inspection by Plaintiff may proceed. Plaintiff may reject dates selected by Defendant in order to select a date with a 50 percent or higher probability of rain totaling 0.1 inch or greater at the Facility.[6] Defendant shall document any alterations to the Facility conditions related to stormwater management during the period between receiving Plaintiff's initial advance notice and the start of Plaintiff's inspection that Defendant would not otherwise have made but for receiving notice of Plaintiff's request to conduct a physical inspection. The documentation shall include the date the alterations related to stormwater management were planned and/or scheduled, the date of the issuance of any purchase order and/or maintenance order, if any, for the alterations, and the date the alterations were implemented. Nothing herein shall be construed to prevent Defendant from continuing to implement any BMPs identified in the SWPPP at any time.

**18. Defendant's Communications with Regional and State Boards.** During the Term of this Consent Decree, Defendant shall provide Plaintiff with copies of all documents and communications submitted to the Regional Board or the State Board concerning BMPs, stormwater or stormwater discharges from the Facility, or compliance with the Storm Water Permit or the Clean Water Act. These documents and communications shall include, but are not limited to, all documents and reports

---

[6] The parties agree to use Weatherunderground.com for this purpose.

submitted to the Regional Board and/or the State Board as required by the Storm Water Permit, and all correspondence between the Regional Board or the State Board and the Defendant or their agents. Such documents and reports shall be provided to Plaintiff pursuant to the Notice provisions of Paragraph 39 herein within five (5) days of Defendant's transmission of said documents to the Regional Board or the State Board. This provision does not extend to information submitted to the Regional Board or the State Board pursuant to Section II.B.3.d of the Storm Water Permit (or a similar provision in the event the Storm Water Permit is changed.) Should information be under Section II.B.3.d of the Storm Water Permit, Defendant shall notify Plaintiff of the submission within thirty (30) days.

### MITIGATION, COMPLIANCE MONITORING AND FEES AND COSTS

**19. Mitigation.** As mitigation of the Clean Water Act violations alleged in Plaintiff's Complaint, Defendant agrees to pay the sum of Fifteen Thousand Dollars ($15,000.00) to the Rose Foundation for Communities and the Environment (the "Rose Foundation") for projects to improve water quality in local watersheds of Sonoma County, including but not limited to the Russian River and any of the Russian River tributaries. The mitigation payment shall be made directly to the Rose Foundation and sent to: The Rose Foundation, 1970 Broadway, Suite 600, Oakland, CA 94612, Attn: Tim Little. The Rose Foundation shall provide notice to the Parties within thirty (30) days of when the funds are dispersed by the Rose Foundation, setting forth the recipient and purpose of the funds. The payment shall be sent within thirty (30) calendar days of the Effective Date.

**20. Plaintiff's Litigation Costs.** To partially reimburse Plaintiff for its investigation fees and costs, expert/consultant fees and costs, reasonable attorneys' fees, and other costs incurred as a result of investigating and filing the lawsuit, and negotiating this Consent Decree, Defendant shall pay a total of Forty-Two Thousand Dollars ($42,000.00). The payment shall be made within thirty (30) calendar days of the Effective Date. The payment shall be made via wire transfer or check, made payable to: "ATA LAW GROUP" and delivered by overnight delivery, unless payment via wire transfer, to: ATA Law Group, 828 San Pablo Ave., Ste. 115B, Albany, CA 94706.

**21. Compliance Monitoring and Oversight.** Defendant agrees to partially defray Plaintiff's reasonable investigative, expert, consultant and attorneys' fees and costs associated with monitoring Defendant's compliance with this Consent Decree in the amount of Eight Thousand Dollars ($8,000.00).

Payment shall be made within thirty (30) calendar days after the Effective Date. Compliance monitoring activities may include, but shall not be limited to, sampling and lab analysis, reasonable investigative, expert, consultant and attorneys' fees and costs, site inspections, review of water quality sampling reports, review of annual reports, discussions with representatives of Defendant concerning any Action Plan(s) referenced above, potential changes to compliance sampling and analysis, and compliance-related activities. The payment shall be made via wire transfer or check, made payable to: "ATA LAW GROUP" and delivered by overnight delivery, unless payment via wire transfer, to: ATA Law Group, 828 San Pablo Ave., Ste. 115B, Albany, CA 94706.

**DISPUTE RESOLUTION**

**22. Jurisdiction of the Court.** The Court shall retain jurisdiction over this matter for the Term of the Consent Decree for the purposes of enforcing its terms and conditions, and adjudicating all disputes among the Parties that may arise under the provisions of this Consent Decree. The Court shall have the authority to enforce this Consent Decree with all available legal and equitable remedies, including contempt.

**23. Meet and Confer.** If a dispute under this Consent Decree arises or either Party believes that a breach of this Consent Decree has occurred, the Parties agree to meet and confer. Either Party to this Consent Decree shall invoke the dispute resolution procedures of this Paragraph by notifying the other Party of the matter(s) in dispute, pursuant to Paragraph 39. The Parties shall schedule a meet and confer (either telephonically or in person) within ten (10) business days from the date of the notice. The Parties may elect to extend this time in an effort to resolve the dispute without mediation or court intervention. If the Parties fail to meet and confer, or cannot resolve a dispute through the informal meet and confer process or through voluntary mediation, either Party shall be entitled to all rights and remedies under the law, including filing a motion with the United States District Court for the Northern District of California. The Parties shall be entitled to seek fees and costs incurred in any such motion, and such fees and costs shall be awarded pursuant to the provisions set forth in Section 505(d) of the Clean Water Act, and case law interpreting such provision.

**MUTUAL RELEASE OF LIABILITY AND COVENANT NOT TO SUE**

**24. Plaintiff's Waiver and Release.** Plaintiff, on its own behalf and on behalf of its officers, directors, employees, parents, subsidiaries, affiliates and each of their successors and assigns, hereby releases Defendant and his employees, successors or assigns, agents, attorneys and other representatives, from, and waives all claims raised in the 60-Day Notice and/or the Complaint, including all claims for fees (including fees of attorneys, experts, and others), costs, expenses, or any other sum incurred or claimed or which could have been claimed for matters included in the 60-Day Notice and/or the Complaint up to the Effective Date.

**25. Defendant's Waiver and Release of Plaintiff.** Defendant, on his own behalf and on behalf of his employees, successors or assigns hereby releases Plaintiff and its officers, directors, employees, members, parents, subsidiaries, and affiliates, and each of their successors and assigns from, and waives all claims which arise from or pertain to the 60-Day Notice and/or the Complaint, including all claims for fees (including fees of attorneys, experts, and others), costs, expenses, or any other sum incurred or claimed or which could have been claimed for matters included in the 60-Day Notice and/or the Complaint up to the Effective Date.

**MISCELLANEOUS PROVISIONS**

**26. No Admission of Liability.** Neither this Consent Decree, the implementation of additional BMPs or any payment pursuant to the Consent Decree shall constitute or be construed as a finding, admission, or acknowledgement of any fact, law, rule, or regulation. Defendant maintains and reserves all defenses he may have to any alleged violations that may be raised in the future.

**27. Submission of Consent Decree to DOJ.** After agreement of the Parties to this proposed Consent Decree, Plaintiff will submit this Consent Decree, and file Proof of Service thereof, with a courtesy copy to Defendant, to the United States Department of Justice and the United States Environmental Protection Agency (collectively, "Federal Agencies") for the statutory review period pursuant to 33 U.S.C. § 1365(c) of at least 45 days prior to the submittal of this Consent Decree to the Court for entry. In the event that the Federal Agencies object to entry of this Consent Decree, the Parties agree to meet and confer to attempt to resolve issue(s) raised by the Federal Agencies within thirty (30) days of receiving notice of such objection.

**28. Early Termination.** If Defendant ceases industrial operations at the Facility and files a Notice of Termination ("NOT") pursuant to the Storm Water Permit prior to the termination date of this Consent Decree, Defendant shall provide notice pursuant to Paragraph 39, of the proposed NOT concurrent with Defendant's submittal to the Regional Board. Within ten (10) days of the Regional Board's approval of the NOT, Defendant shall notify Plaintiff, pursuant to Paragraph 39, of the approval and remit all outstanding payments to Plaintiff and the Rose Foundation. In the event a successor or assign continues industrial operations at the Facility and assumes responsibility for implementation of this Consent Decree pursuant to Paragraph 38, Defendant shall notify Plaintiff pursuant to Paragraph 39 within ten (10) calendar days of said continuation.

**29. Execution in Counterparts and Signatures.** The Consent Decree may be executed in one of more counterparts, which, taken together, shall constitute one original document. The Parties' signatures to this Consent Decree may be electronic or original, and whether transmitted by courier, mail, email or facsimile, shall be deemed binding.

**30. Construction.** The language in all parts of this Consent Decree shall be construed according to its plain and ordinary meaning, except as to those terms defined in the Storm Water Permit, the Clean Water Act, or specifically herein. The captions and Paragraph headings used in this Consent Decree are for reference only and shall not affect the interpretation of this Consent Decree.

**31. Authority to Sign.** The undersigned representatives for Plaintiff and Defendant certify that they are fully authorized by the Party whom they represent to enter into the terms and conditions of this Consent Decree, which have been read, understood and agreed to.

**32. Integrated Consent Decree**. All agreements, covenants, representations and warranties, express or implied, oral or written, of the Parties concerning the subject matter of this Consent Decree are contained herein.

**33. Severability.** In the event that any of the provisions of this Consent Decree are held by a Court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

**34. Choice of Law.** This Consent Decree shall be governed by the laws of the United States or, where applicable, the laws of the State of California.

**35. Full Settlement.** This Consent Decree constitutes a full and final settlement of this matter.

**36. Negotiated Agreement.** The Parties have negotiated this Consent Decree, and agree that it shall not be construed against the Party preparing it, but shall be construed as if the Parties jointly prepared this Consent Decree, and any uncertainty and ambiguity shall not be interpreted against either Party.

**37. Modification of the Agreement.** This Consent Decree, and any provisions herein, may not be changed, waived, or discharged unless by a written instrument signed by each of the Parties.

**38. Assignment.** Subject only to the express restrictions contained in this Consent Decree, all of the rights, duties and obligations contained in this Consent Decree shall inure to the benefit of and be binding upon the Parties and their successors, assigns, and agents.

**39. Notice.** Unless otherwise stipulated to by the receiving Party, any notices or documents required or provided for by this Consent Decree or related thereto that are to be provided to Plaintiff pursuant to this Consent Decree shall be sent via certified mail, return receipt requested, with courtesy copy by electronic mail to the addresses listed below:

Bill Jennings, Executive Director
California Sportfishing Protection Alliance
3536 Rainier Avenue
Stockton, CA 95204
Email: deltakeep@me.com

Anthony M. Barnes
Aqua Terra Aeris Law Group LLP
828 San Pablo Ave., Ste. 115B
Albany, CA 94706
Phone: (415) 326-3173
Email: amb@atalawgroup.com

Any notices or documents required or provided for by this Consent Agreement or related thereto that are to be provided to Defendant pursuant to this Consent Agreement shall be sent via certified mail, return receipt requested, with courtesy copy by electronic mail to the addresses listed below:

Rick Dapelo, Owner
Quality Stainless Tanks
510 Caletti Ave,
Windsor, CA 95492
Email: winetanksoffice@gmail.com

James R.  Arnold
The Arnold Law Practice
(East Bay Office)
3685 Mt Diablo Blvd #331,
Lafayette, CA 94549
Phone: (925) 284-8887
Email: jarnold@arnoldlp.com
        jbeard@arnoldlp.com

Each Party shall promptly notify all other Parties of any change in the above-listed contact information.

**40. Force Majeure.** No Party shall be considered to be in default in the performance of any of its obligations when a failure to perform is due to a "Force Majeure." A Force Majeure event is any circumstances beyond the Party's reasonable control, including, without limitation, any act of God, war, fire, earthquake, flood, and restraint by court order or public authority. A Force Majeure event does not include normal inclement weather, such as anything less than or equal to a 100 year/24-hour storm event, or inability to pay. Any Party seeking to rely upon this Paragraph shall have the burden of establishing that it could not reasonably have been expected to avoid, and which by exercise of due diligence has been unable to overcome, the Force Majeure.

The Parties hereto enter into this Consent Decree, Order and Final Judgment and submit it to the Court for its approval and entry as a final judgment.

Dated: _____Sept. 8, 2017_____, 2017    By: _____

Bill Jennings, Executive Director
California Sportfishing Protection Alliance

Dated: _____, 2017    By: _____

Richard Dapelo
Defendant

**Good cause appearing, IT IS SO ORDERED.**

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA**

Dated: _____, 2017    _____

Honorable Edward M. Chen
United States District Judge

1     **40. Force Majeure.** No Party shall be considered to be in default in the performance of any of its

2     obligations when a failure to perform is due to a "Force Majeure." A Force Majeure event is any

3     circumstances beyond the Party's reasonable control, including, without limitation, any act of God, war,

4     fire, earthquake, flood, and restraint by court order or public authority. A Force Majeure event does not

5     include normal inclement weather, such as anything less than or equal to a 100 year/24-hour storm

6     event, or inability to pay. Any Party seeking to rely upon this Paragraph shall have the burden of

7     establishing that it could not reasonably have been expected to avoid, and which by exercise of due

8     diligence has been unable to overcome, the Force Majeure.

9     The Parties hereto enter into this Consent Decree, Order and Final Judgment and submit it to the

10     Court for its approval and entry as a final judgment.

12   Dated: _____, 2017      By: _____

13                                        Bill Jennings, Executive Director
                                        California Sportfishing Protection Alliance

15   Dated:   $09/11/17$, 2017      By: _____

16                                           Richard Bapelo

17                                           Defendant

18

19   **Good cause appearing, IT IS SO ORDERED.**

20                                           **UNITED STATES DISTRICT COURT**

21                                           **NORTHERN DISTRICT OF CALIFORNIA**

23   Dated: _____, 2017

24                                           Honorable Edward M. Chen
                                        United States District Judge

# EXHIBIT A



S:\OAKLAND\DIXON PROJECTS\QUALITY STAINLESS TANKS\SITE FIGURES\ROUX\CAD\QST SITE FIGURE.DWG

WEST COAST METALS

QUALITY STAINLESS TANKS

M&M SERVICES

**Title:** SITE MAP
510 CALETTI AVENUE, WINDSOR, CALIFORNIA

**Prepared For:** QUALITY STAINLESS TANKS

| Compiled by: LA | Date: 01AUG17 | FIGURE |
| Prepared by: LA | Scale: AS SHOWN | |
| Project Mgr: DD | Project: 2906.0001S000 | **1** |
| File: QST SITE FIGURE.DWG | | |

ROUX
ROUX ASSOCIATES, INC.
*Environmental Consulting & Management*

LEGEND
X——X——X   FENCELINE/FACILITY BOUNDARY (APPROXIMATE)
————————   BUILDING/STRUCTURE OUTLINE (APPROXIMATE)
12"RCP–182'   STORM DRAIN LINE AND FLOW DIRECTION (APPROXIMATE)
■   STORM DRAIN (APPROXIMATE LOCATION)
～～～   SURFACE DRAINAGE DIRECTION
┋┋┋┋┋   EXISTING BERM
▨▨▨▨   PROPOSED BERM OR TRENCH DRAIN
————————   ROADWAY (APPROXIMATE)

NOTES
• DROP INLET FILTERS TO BE INSTALLED IN DROP INLETS W–2, W–3, AND W–4
• ALL FACILITY DRAINAGE SURFACES ARE IMPERVIOUS UNLESS OTHERWISE NOTED ABOVE

# EXHIBIT B



November 21, 2016

**<u>VIA U.S. CERTIFIED MAIL, RETURN RECEIPT REQUESTED</u>**

Rick Dapelo, Owner                          Sean Headden, Operations Manager
Quality Stainless Tanks                       Quality Stainless Tanks
510 Caletti Ave,                                 510 Caletti Ave,
Windsor, CA 95492                          Windsor, CA 95492


RE:    **NOTICE OF VIOLATIONS AND INTENT TO FILE SUIT UNDER THE FEDERAL WATER POLLUTION CONTROL ACT ("CLEAN WATER ACT") (33 U.S.C. §§ 1251 *et seq.*)**

Dear Mr. Dapelo & Mr. Headden,

This firm represents California Sportfishing Protection Association ("CSPA"), a California non-profit association, in regard to violations of the Clean Water Act ("CWA" or "the Act") occurring at Quality Stainless Tanks' manufacturing facility at 510 Caletti Ave, Windsor, CA (the "Facility"). This letter is being sent to you as the responsible owners, officers, and/or operators of the Facility. Unless otherwise noted, Quality Stainless Tanks shall hereinafter be referred to as "QST," and Rick Dapelo and Sean Headden shall hereinafter be collectively referred to as the "Owners/Operators." CSPA is a non-profit association dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources throughout the state of California, including the Russian River Basin, and Pruitt Creek, into which QST discharges polluted storm water.

QST is in ongoing violation of the substantive and procedural requirements of the CWA, 33 U.S.C. § 1251 *et seq.*; and California's General Industrial Storm Water Permit, National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001 ("General Permit"), Water Quality Order No. 97-03-DWQ ("1997 General Permit"), as superseded by Order No. 2015-0057-DWQ ("2015 General Permit").[1]

The 1997 General Permit was in effect between 1997 and June 30, 2015, and the 2015 General Permit went into effect on July 1, 2015. As will be explained below, the 2015 General Permit includes many of the same fundamental requirements, and implements many of the same statutory requirements, as the 1997 General Permit.

---

[1] QST submitted a NOI to comply with the General Permit for the Facility on or about June 23, 2015.

CWA Notice of Intent to Sue
Quality Stainless Tanks
November 21, 2016
Page 2 of 13



Violations of the General Permit constitute ongoing violations for purposes of CWA enforcement. 2015 General Permit, Finding A.6.

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act subjects QST to a penalty of up to $37,500 per day, per violation for all violations occurring during the period commencing five years prior to the date of this Notice of Violation and Intent to File Suit. In addition to civil penalties, CSPA will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) of the Act (33 U.S.C. §§ 1365(a), (d)) and such other relief as permitted by law. Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)) permits prevailing parties to recover costs and fees including attorneys' fees.

The CWA requires that sixty (60) days prior to the initiation of a citizen-enforcement action under Section 505(a) of the Act (33 U.S.C. § 1365(a)), a citizen enforcer must give notice of its intent to file suit. Notice must be given to the alleged violator, the U.S. Environmental Protection Agency, and the Chief Administrative Officer of the water pollution control agency for the State in which the violations occur. *See* 40 C.F.R. 135.2.

As required by the Act, this letter provides statutory notice of the violations that have occurred, and continue to occur, at the Facility. 40 C.F.R. § 135.3(a). At the expiration of sixty (60) days from the date of this letter, CSPA intends to file suit under Section 505(a) of the Act (33 U.S.C. § 1365(a)) in federal court against Quality Stainless Tanks for violations of the Act and the General Permit.

## I.     Background

### A.     The Clean Water Act

Congress enacted the CWA in 1972 in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. The Act prohibits the discharge of pollutants into United States waters except as authorized by the statute. 33 U.S.C. § 1311; *San Francisco Baykeeper, Inc. v. Tosco Corp.*, 309 F.3d 1153, 1156 (9th Cir. 2002). The Act is administered largely through the NPDES permit program. 33 U.S.C. § 1342. In 1987, the Act was amended to establish a framework for regulating storm water discharges through the NPDES system. Water Quality Act of 1987, Pub. L. 100-4, § 405, 101 Stat. 7, 69 (1987) (codified at 33 U.S.C. § 1342(p)); *see also Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 840-41 (9th Cir. 2003) (describing the problem of storm water runoff and summarizing the Clean Water Act's permitting scheme). The discharge of pollutants without an NPDES permit, or in violation of a NPDES permit, is illegal. *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1145 (9th Cir. 2000).



Much of the responsibility for administering the NPDES permitting system has been delegated to the states. *See* 33 U.S.C. § 1342(b); *see also* Cal. Water Code § 13370 (expressing California's intent to implement its own NPDES permit program). The CWA authorizes states with approved NPDES permit programs to regulate industrial storm water discharges through individual permits issued to dischargers, as well as through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(b). Pursuant to Section 402 of the Act, the Administrator of EPA has authorized California's State Board to issue individual and general NPDES permits in California. 33 U.S.C. § 1342.

### B.    California's General Permit for Storm Water Discharges Associated with Industrial Activities

Between 1997 and June 30, 2015, the General Permit in effect was Order No. 97-03-DWQ, which CSPA refers to as the "1997 General Permit." On July 1, 2015, pursuant to Order No. 2015-0057-DWQ the General Permit was reissued, including many of the same fundamental terms as the prior permit. For the purposes of this notice letter, CSPA refers to the reissued permit as the "2015 General Permit." The 2015 General Permit rescinded in whole the 1997 General Permit, except for the expired permit's requirement that annual reports be submitted by July 1, 2015, and for purposes of CWA enforcement. 2015 General Permit, Finding A.6.

Facilities discharging, or having the potential to discharge, storm water associated with industrial activities that have not obtained an individual NPDES permit must apply for coverage under the General Permit by filing a Notice of Intent to Comply ("NOI"). 1997 General Permit, Provision E.1; 2015 General Permit, Standard Condition XXI.A. Facilities must file their NOIs before the initiation of industrial operations. *Id.*

Facilities must strictly comply with all of the terms and conditions of the General Permit. A violation of the General Permit is a violation of the CWA.

The General Permit contains three primary and interrelated categories of requirements: (1) discharge prohibitions, receiving water limitations and effluent limitations; (2) Storm Water Pollution Prevention Plan ("SWPPP") requirements; and (3) self-monitoring and reporting requirements.

### C.    QST's Windsor Facility

QST's industrial facility at Windsor consists of an outdoor welding area, metal parts storage areas, sanding and painting area, a metal saw area, raw materials receiving and storage areas, finished tank storage areas, process pond, and a 55-gallon diesel drum in a concrete dike. The industrial activities of the Facility fall under Standard Industrial Classification ("SIC") Code 3443, Fabricated Plate Work.



QST collects and discharges storm water associated with industrial activities pursuant to the General Permit through three underground storm drain pipes. The sampling sites for these discharge locations are identified in the SWPPP as W-1, W-2 and W-3. These discharges enter Pruitt Creek, which is a tributary to the Russian River. Pruitt Creek and the Russian River are waters of the United States within the meaning of the CWA. SW-5 is a further sampling site identified in the SWPPP, but it does not appear sampling has taken place at this site after 2012.

The General Permit requires QST to analyze storm water samples for Total Suspended Solids ("TSS"), pH, and Oil and Grease. 1997 General Permit, Section B.5.c.i; 2015 General Permit, Section XI.B.6. Facilities under SIC Code 3443 must also analyze storm water samples for Zinc, Nitrate and Nitrate Nitrogen, Iron, and Aluminum. 1997 General Permit, Tables 1-2; 2015 General Permit Tables 1-2.

## II.     QST's Violations of the Act and the General Permit

Based on its review of available public documents, CSPA is informed and believes that QST is in ongoing violation of both the substantive and procedural requirements of the CWA, and the General Permit. These violations are ongoing and continuous. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the CWA, QST is subject to penalties for violations of the Act since November 21, 2011.

### A.     QST Discharges Storm Water Containing Pollutants in Violation of the General Permit's Discharge Prohibitions, Receiving Water Limitations, and Effluent Limitations.

QST's storm water sampling results provide conclusive evidence of its failure to comply with the General Permit's discharge prohibitions, receiving water limitations and effluent limitations. Self-monitoring reports under the General Permit are deemed "conclusive evidence of an exceedance of a permit limitation."  *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

### 1.     Applicable Water Quality Standards

The General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance. 1997 General Permit, Discharge Prohibition A.2; 2015 General Permit, Discharge Prohibition III.C. The General Permit also prohibits discharges that violate any discharge prohibition contained in the applicable Regional Water Board's Basin Plan or statewide water quality control plans and policies. 1997 General Permit, Receiving Water Limitation C.2; 2015 General Permit, Discharge Prohibition III.D. Furthermore, storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or



contribute to a violation of any water quality standards in any affected receiving water. 1997 General Permit, Receiving Water Limitations C.1, C.2; 2015 General Permit, Receiving Water Limitations VI.A, VI.B.

Dischargers are also required to prepare and submit documentation to the Regional Board upon determination that storm water discharges are in violation of the General Permit's Receiving Water Limitations. 1997 General Permit, p. VII; 2015 General Permit, Special Condition XX.B. The documentation must describe changes the discharger will make to its current storm water best management practices ("BMPs") in order to prevent or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards.  *Id.*

The California Toxics Rule ("CTR") is an applicable water quality standard under the Permit, violation of which is a violation of Permit conditions. *Cal. Sportfishing Prot. Alliance v. Chico Scrap Metal, Inc.,* 2015 U.S. Dist. LEXIS 108314, *21 (E.D. Cal. 2015) CTR establishes numeric receiving water limits for toxic pollutants in California surface waters. 40 C.F.R. § 131.38. The CTR establishes a numeric limit for at least one of the pollutants discharged by QST:  Zinc – 0.12 mg/L (maximum concentration).

The *Water Quality Control Plan for the North Coast Region* ("Basin Plan") also sets forth water quality standards and prohibitions applicable to QST's storm water discharges. While the Basin Plan does not specify beneficial uses for Pruitt Creek, it does identify existing and potential uses for the Russian River, to which Pruitt Creek is tributary. Thus, the existing beneficial uses for Pruitt Creek include municipal and domestic water supply, agricultural supply, industrial service supply, industrial process supply, groundwater recharge, navigation, hydropower generation, commercial and sport fishing, wildlife habitat, warm freshwater habitat, cold freshwater habitat, warm and cold spawning, migration, aquaculture, and contact and non-contact water recreation.

### 2.    Applicable Effluent Limitations

Dischargers are required to reduce or prevent pollutants in their storm water discharges through implementation of best available technology economically achievable ("BAT") for toxic and nonconventional pollutants and best conventional pollutant control technology ("BCT") for conventional pollutants. 1997 General Permit, Effluent Limitation B.3; 2015 General Permit, Effluent Limitation V.A. Conventional pollutants include Total Suspended Solids, Oil & Grease, pH, Biochemical Oxygen Demand and Fecal Coliform. 40 C.F.R. § 401.16. All other pollutants are either toxic or nonconventional. 40 C.F.R. §§ 401.15-16.

Under the General Permit, benchmark levels established by the EPA ("EPA benchmarks") serve as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. *Santa Monica*

CWA Notice of Intent to Sue
Quality Stainless Tanks
November 21, 2016
Page 6 of 13



*Baykeeper v. Kramer Metals,* 619 F.Supp.2d 914, 920, 923 (C.D. Cal 2009); 1997 General Permit, Effluent Limitations B.5-6; 2015 General Permit, Exceedance Response Action XII.A.

The following EPA benchmarks have been established for pollutants discharged by QST: Total Suspended Solids – 100 mg/L; Zinc – 0.117 mg/L; Aluminum – 0.75 mg/L; Nitrate plus Nitrate Nitrogen – 0.68 mg/L; and Iron – 1 mg/L.

### 3.    Quality Stainless Tanks' Storm Water Sample Results

The SWPPP prepared for QST (dated June 23, 2016) reported exceedances of water quality standards in 2010, 2011 and 2012 for Aluminum, Copper, Iron, Lead, Zinc, Nitrate, Conductivity, and Total Suspended Solids. Further testing undertaken on February 6, 2015, found exceedances for Aluminum, Iron, Zinc, Nitrate, Conductivity, and Total Suspended Solids.

The following discharges of pollutants from the Facility have violated the discharge prohibitions, receiving water limitations, and effluent limitations of the permit.

### a.    Discharge of Storm Water Containing Total Suspended Solids (TSS) at Concentrations in Excess of Applicable EPA Benchmark Value

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 1/19/2012 | SW-5 | TSS | 570 | 100 |
| 2/16/2015 | W-1 | TSS | 1300 | 100 |
| 2/16/2015 | W-2 & W-3 composite | TSS | 110 | 100 |
| 2/16/2015 | W-2 & W-3 composite | TSS | 110 | 100 |
| 1/29/2016 | W-2 & W-3 composite | TSS | 220 | 100 |
| 1/29/2016 | W-2 & W-3 composite | TSS | 220 | 100 |
| 3/4/2016 | W-1 | TSS | 290 | 100 |
| 3/4/2016 | W-2 & W-3 composite | TSS | 190 | 100 |
| 3/4/2016 | W-2 & W-3 composite | TSS | 190 | 100 |

CWA Notice of Intent to Sue
Quality Stainless Tanks
November 21, 2016
Page 7 of 13



**b.    Discharges of Storm Water Containing Zinc (Zn) at Concentrations in Excess of Applicable EPA Benchmark and CTR Values**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) | CTR Criteria (mg/L) |
|---|---|---|---|---|---|
| 1/19/2012 | SW-5 | Zn | 0.45 | 0.117 | 0.12 |
| 2/6/2015 | W-1 | Zn | 1.8 | 0.117 | 0.12 |
| 2/6/2015 | W-2 & W-3 composite | Zn | 0.22 | 0.117 | 0.12 |
| 2/6/2015 | W-2 & W-3 composite | Zn | 0.22 | 0.117 | 0.12 |
| 1/29/2016 | W-1 | Zn | 0.16 | 0.117 | 0.12 |
| 1/29/2016 | W-2 & W-3 composite | Zn | 0.23 | 0.117 | 0.12 |
| 1/29/2016 | W-2 & W-3 composite | Zn | 0.23 | 0.117 | 0.12 |
| 3/4/2016 | W-1 | Zn | 0.41 | 0.117 | 0.12 |
| 3/4/2016 | W-2 & W-3 composite | Zn | 0.22 | 0.117 | 0.12 |
| 3/4/2016 | W-2 & W-3 composite | Zn | 0.22 | 0.117 | 0.12 |

**c.    Discharges of Storm Water Containing Iron (Fe) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 1/19/2012 | SW-5 | Fe | 27 | 1.0 |
| 2/6/2015 | W-1 | Fe | 53 | 1.0 |
| 2/6/2015 | W-2 & W-3 composite | Fe | 9.3 | 1.0 |
| 2/6/2015 | W-2 & W-3 composite | Fe | 9.3 | 1.0 |
| 12/9/2015 | W-1 | Fe | 2.3 | 1.0 |

CWA Notice of Intent to Sue
Quality Stainless Tanks
November 21, 2016
Page 8 of 13



| 12/9/2015 | W-2 & W-3 composite | Fe | 6.2 | 1.0 |
| 12/9/2015 | W-2 & W-3 composite | Fe | 6.2 | 1.0 |
| 1/29/2016 | W-1 | Fe | 7.3 | 1.0 |
| 1/29/2016 | W-2 & W-3 composite | Fe | 14 | 1.0 |
| 1/29/2016 | W-2 & W-3 composite | Fe | 14 | 1.0 |
| 3/4/2016 | W-1 | Fe | 24 | 1.0 |
| 3/4/2016 | W-2 & W-3 composite | Fe | 12 | 1.0 |
| 3/4/2016 | W-2 & W-3 composite | Fe | 12 | 1.0 |

**d.    Discharges of Storm Water Containing Nitrate plus Nitrate Nitrogen (N + N) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 1/19/2012 | SW-5 | N + N | 6.2 | 0.68 |
| 2/6/2015 | W-1 | N + N | 7.65 | 0.68 |
| 2/6/2015 | W-2 & W-3 composite | N + N | 0.88 | 0.68 |
| 2/6/2015 | W-2 & W-3 composite | N + N | 0.88 | 0.68 |
| 12/9/2015 | W-1 | N + N | 35.19 | 0.68 |
| 1/29/2016 | W-1 | N + N | 0.87 | 0.68 |
| 12/9/2016 | W-2 & W-3 composite | N + N | 1.3 | 0.68 |
| 12/9/2016 | W-2 & W-3 composite | N + N | 1.3 | 0.68 |
| 3/4/2016 | W-1 | N + N | 4.67 | 0.68 |

CWA Notice of Intent to Sue
Quality Stainless Tanks
November 21, 2016
Page 9 of 13



e.    **Discharges of Storm Water Containing Aluminum (Al) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 1/19/2012 | SW-5 | Al | 18 | 0.75 |
| 2/6/2015 | W-1 | Al | 29 | 0.75 |
| 2/6/2015 | W-2 & W-3 composite | Al | 6.7 | 0.75 |
| 2/6/2015 | W-2 & W-3 composite | Al | 6.7 | 0.75 |
| 3/4/2016 | W-1 | Al | 14 | 0.75 |
| 1/29/2016 | W-2 & W-3 composite | Al | 6.3 | 0.75 |
| 1/29/2016 | W-2 & W-3 composite | Al | 6.3 | 0.75 |
| 3/4/2016 | W-2 & W-3 composite | Al | 5.9 | 0.75 |
| 3/4/2016 | W-2 & W-3 composite | Al | 5.9 | 0.75 |
| 12/9/2015 | W-2 & W-3 composite | Al | 5 | 0.75 |
| 12/9/2015 | W-2 & W-3 composite | Al | 5 | 0.75 |
| 1/29/2016 | W-1 | Al | 4.4 | 0.75 |
| 12/9/2015 | W-1 | Al | 1.5 | 0.75 |

f.    **QST's Sample Results Are Evidence of Violations of the General Permit**

QST's sample results demonstrate violations of the General Permit's discharge prohibitions, receiving water limitations, and effluent limitations set forth above. CSPA is informed and believes that the QST has known that its storm water contains pollutants at levels exceeding General Permit standards since at least November 21, 2011.

CSPA alleges that such violations occur each time storm water discharges from the Facility. Attachment A hereto, sets forth the specific rain dates on which CSPA alleges that QST has discharged storm water containing impermissible levels of TSS, Zn, Fe, Al and N + N in violation of the General Permit. 1997 General Permit, Discharge



Prohibition A.2, Receiving Water Limitations C.1 and C.2; 2015 General Permit, Discharge Prohibitions III.C and III.D, Receiving Water Limitations VI.A, VI.B.

### 4.     QST Has Failed to Implement BAT and BCT

Dischargers must implement BMPs that fulfill the BAT/BCT requirements of the CWA and the General Permit to reduce or prevent discharges of pollutants in their storm water discharges. 1997 General Permit, Effluent Limitation B.3; 2015 General Permit, Effluent Limitation V.A. To meet the BAT/BCT standard, dischargers must implement minimum BMPs and any advanced BMPs set forth in the General Permit's SWPPP Requirements provisions where necessary to reduce or prevent pollutants in discharges. *See* 1997 General Permit, Sections A.8.a-b; 2015 General Permit, Sections X.H.1-2.

QST has failed to implement the minimum BMPs required by the General Permit, including: good housekeeping requirements; preventive maintenance requirements; spill and leak prevention and response requirements; material handling and waste management requirements; erosion and sediment controls; employee training and quality assurance; and record keeping. 1997 General Permit, Sections A.8.a(i–x); 2015 General Permit, Sections X.H.1(a–g).

QST has further failed to implement advanced BMPs necessary to reduce or prevent discharges of pollutants in its storm water sufficient to meet the BAT/BCT standards, including: exposure minimization BMPs; containment and discharge reduction BMPs; treatment control BMPs; or other advanced BMPs necessary to comply with the General Permit's effluent limitations. 1997 General Permit, Section A.8.b; 2015 General Permit, Sections X.H.2.

Each day the Owners/Operators have failed to develop and implement BAT and BCT at the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the CWA (33 U.S.C. § 1311(a)). The violations described above were at all times in violation of Section A of the 1997 General Permit, and Section X of the 2015 General Permit. Accordingly, the Owners/Operators have been in violation of the BAT and BCT requirements at the Facility every day since at least November 21, 2011.

### 5.     QST Has Failed to Develop and Implement an Adequate Storm Water Pollution Plan

The General Permit requires dischargers to develop and implement a site-specific SWPPP. 1997 General Permit, Section A.1; 2015 General Permit, Section X.A. The SWPPP must include, among other elements: (1) the facility name and contact information; (2) a site map; (3) a list of industrial materials; (4) a description of potential pollution sources; (5) an assessment of potential pollutant sources; (6) minimum BMPs;

CWA Notice of Intent to Sue
Quality Stainless Tanks
November 21, 2016
Page 11 of 13



(7) advanced BMPs, if applicable; (8) a monitoring implementation plan; (9) annual comprehensive facility compliance evaluation; and (10) the date that the SWPPP was initially prepared and the date of each SWPPP amendment, if applicable. *See id.*

Dischargers must revise their SWPPP whenever necessary and certify and submit via the Regional Board's Storm Water Multiple Application and Report Tracking System ("SMARTS") their SWPPP within 30 days whenever the SWPPP contains significant revisions(s); and, certify and submit via SMARTS for any non-significant revisions not more than once every three (3) months in the reporting year. 2015 General Permit, Section X.B; see also 1997 General permit, Section A.

CSPA's investigation indicates that QST has been operating with an inadequately developed or implemented SWPPP in violation of General Permit requirements. QST has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary, resulting in the Facility's numerous effluent limitation violations.

Each day the Owners/Operators failed to develop and implement an adequate SWPPP is a violation of the General Permit. The SWPPP violations described above were at all times in violation of Section A of the 1997 General Permit, and Section X of the 2015 General Permit. The Owners/Operators have been in violation of these requirements at the Facility every day since at least November 21, 2011.

### 6.    QST's Aerial Deposition Containing Pollutants Enters Storm Drains and Surface Waters Without NPDES Coverage.

Pollution entering surface waters via air deposition is also recognized as a significant cause of degradation of water quality. Such discharges of pollutants from industrial facilities contribute to the impairment of downstream waters and aquatic dependent wildlife. Information available to CSPA indicates that outdoor industrial operations at the Facility create dust and particulate matter from, as two examples only, high-volume traffic and sanding and sawing steel. These activities lack containment or secondary containment. And have been ongoing since at least 2009. This dust and particulate matter migrates to surface waters and/or the storm drain system of Sonoma County.

### III.    Persons Responsible for the Violations

CSPA puts QST on notice that it is the entity responsible for the violations described above. If additional persons are subsequently identified as also being responsible for the violations set forth above, CSPA puts QST on formal notice that it intends to include those persons in this action.

CWA Notice of Intent to Sue
Quality Stainless Tanks
November 21, 2016
Page 12 of 13



## IV.   Name and Address of Noticing Party

The name, address, and telephone number of the noticing party is as follows:

Bill Jennings, Executive Director
California Sportfishing Protection Alliance
3536 Rainier Ave,
Stockton, CA 95204
(209) 464-5067
www.calsport.org

## V.   Counsel

CSPA has retained legal counsel to represent it in this matter. Please direct all communications to:

Jason R. Flanders
AQUA TERRA AERIS (ATA) LAW GROUP
828 San Pablo Ave, Ste. 115B
Albany, CA 94706
(916) 202-3018
jrf@atalawgroup.com

## VI.   Conclusion

CSPA believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit. We intend to file a citizen suit under Section 505(a) of the CWA against Quality Stainless Tanks and its agents for the above-referenced violations upon the expiration of the 60-day notice period. If you wish to pursue remedies in the absence of litigation, we suggest that you initiate those discussions within the next twenty (20) days so that they may be completed before the end of the 60-day notice period. We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

_____
Jason R. Flanders
ATA Law Group
Counsel for CSPA

CWA Notice of Intent to Sue
Quality Stainless Tanks
November 21, 2016
Page 13 of 13



## <u>SERVICE LIST</u>

### <u>VIA CERTIFIED MAIL</u>

Lisa Jackson, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

Alexis Strauss, Acting Administrator
U.S. Environmental Protection Agency
Region IX
75 Hawthorne Street
San Francisco, CA 94105

Thomas Howard, Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, CA 95812

Matthias St John, Executive Officer North
Coast Regional Water Quality Control
Board 5550 Skylane Blvd, Ste A
Santa Rosa, CA 95403-1072

**EXHIBIT A**
Rain Data from Sonoma Airport
11-20-2011 - 11-18-2016
Days with Precipitation over .1

| Date | Precipitation (Inches) |
|---|---|
| 11/23/2011 | 0.26 |
| 11/24/2011 | 0.58 |
| 12/15/2011 | 0.18 |
| 1/19/2012 | 0.86 |
| 1/20/2012 | 2.77 |
| 1/21/2012 | 0.24 |
| 1/22/2012 | 1.84 |
| 1/23/2012 | 1.26 |
| 2/7/2012 | 0.66 |
| 2/12/2012 | 0.24 |
| 2/28/2012 | 0.3 |
| 2/29/2012 | 0.46 |
| 3/1/2012 | 0.17 |
| 3/13/2012 | 2.35 |
| 3/14/2012 | 0.42 |
| 3/15/2012 | 0.12 |
| 3/16/2012 | 1.17 |
| 3/24/2012 | 0.87 |
| 3/25/2012 | 0.11 |
| 3/27/2012 | 1.67 |
| 3/31/2012 | 0.44 |
| 4/10/2012 | 0.61 |
| 4/12/2012 | 0.94 |
| 4/13/2012 | 0.39 |
| 5/3/2012 | 0.13 |
| 10/22/2012 | 1.13 |
| 10/23/2012 | 0.23 |
| 10/31/2012 | 0.86 |
| 11/16/2012 | 0.9 |
| 11/17/2012 | 1.12 |
| 11/20/2012 | 1.08 |
| 11/28/2012 | 1.27 |
| 11/29/2012 | 1.62 |
| 11/30/2012 | 2.17 |
| 12/1/2012 | 1.12 |
| 12/2/2012 | 1.67 |
| 12/4/2012 | 0.71 |
| 12/5/2012 | 0.31 |
| 12/15/2012 | 0.12 |
| 12/16/2012 | 0.37 |
| 12/17/2012 | 0.21 |
| 12/20/2012 | 0.39 |
| 12/21/2012 | 2.55 |
| 12/22/2012 | 0.59 |

| Date | Precipitation (Inches) |
|------|------------------------|
| 12/23/2012 | 2.37 |
| 12/25/2012 | 0.65 |
| 12/26/2012 | 0.51 |
| 1/5/2013 | 0.44 |
| 1/23/2013 | 0.4 |
| 2/19/2013 | 0.17 |
| 3/5/2013 | 0.37 |
| 3/6/2013 | 0.52 |
| 3/19/2013 | 0.13 |
| 3/20/2013 | 0.41 |
| 3/31/2013 | 0.96 |
| 4/4/2013 | 0.94 |
| 5/27/2013 | 0.16 |
| 6/24/2013 | 0.24 |
| 6/25/2013 | 1.14 |
| 9/20/2013 | 0.16 |
| 9/21/2013 | 0.24 |
| 11/19/2013 | 0.74 |
| 11/20/2013 | 0.32 |
| 12/6/2013 | 0.41 |
| 2/2/2014 | 0.63 |
| 2/5/2014 | 0.3 |
| 2/6/2014 | 0.54 |
| 2/7/2014 | 1.42 |
| 2/8/2014 | 3.46 |
| 2/9/2014 | 0.74 |
| 2/26/2014 | 1.56 |
| 2/28/2014 | 0.67 |
| 3/3/2014 | 0.38 |
| 3/5/2014 | 0.37 |
| 3/26/2014 | 0.32 |
| 3/29/2014 | 0.49 |
| 3/31/2014 | 0.67 |
| 4/1/2014 | 0.48 |
| 4/4/2014 | 0.14 |
| 9/18/2014 | 0.1 |
| 9/25/2014 | 0.12 |
| 9/26/2014 | 0.55 |
| 10/15/2014 | 0.11 |
| 10/25/2014 | 0.15 |
| 10/31/2014 | 0.24 |
| 11/13/2014 | 0.1 |
| 11/19/2014 | 0.36 |
| 11/20/2014 | 0.3 |
| 11/22/2014 | 0.1 |
| 11/28/2014 | 0.14 |
| 11/29/2014 | 0.28 |
| 11/30/2014 | 0.42 |
| 12/2/2014 | 0.69 |
| 12/3/2014 | 1.25 |

| Date | Precipitation (Inches) |
|---|---|
| 12/5/2014 | 0.63 |
| 12/8/2014 | 0.12 |
| 12/9/2014 | 0.13 |
| 12/10/2014 | 1.32 |
| 12/11/2014 | 4.66 |
| 12/12/2014 | 0.41 |
| 12/14/2014 | 0.1 |
| 12/15/2014 | 2.31 |
| 12/16/2014 | 1.12 |
| 12/17/2014 | 0.29 |
| 12/18/2014 | 0.18 |
| 12/19/2014 | 0.78 |
| 12/20/2014 | 0.33 |
| 2/6/2015 | 2.62 |
| 2/8/2015 | 1.31 |
| 2/9/2015 | 0.23 |
| 4/5/2015 | 0.18 |
| 4/6/2015 | 0.1 |
| 4/7/2015 | 0.65 |
| 4/24/2015 | 0.46 |
| 9/16/2015 | 0.41 |
| 11/1/2015 | 0.18 |
| 11/2/2015 | 0.26 |
| 11/9/2015 | 0.49 |
| 11/15/2015 | 0.43 |
| 11/24/2015 | 0.11 |
| 12/3/2015 | 0.82 |
| 12/4/2015 | 0.12 |
| 12/6/2015 | 0.85 |
| 12/9/2015 | 0.43 |
| 12/10/2015 | 0.56 |
| 12/12/2015 | 0.2 |
| 12/13/2015 | 0.88 |
| 12/18/2015 | 0.73 |
| 12/19/2015 | 0.1 |
| 12/20/2015 | 0.69 |
| 12/21/2015 | 1.16 |
| 12/22/2015 | 0.14 |
| 12/24/2015 | 0.21 |
| 1/3/2016 | 0.32 |
| 1/4/2016 | 0.4 |
| 1/5/2016 | 1.04 |
| 1/6/2016 | 2.55 |
| 1/7/2016 | 0.12 |
| 1/9/2016 | 0.31 |
| 1/12/2016 | 0.1 |

| Date | Precipitation (Inches) |
|---|---|
| 1/13/2016 | 0.82 |
| 1/14/2016 | 0.61 |
| 1/15/2016 | 0.27 |
| 1/16/2016 | 0.5 |
| 1/17/2016 | 1.17 |
| 1/19/2016 | 1.51 |
| 1/22/2016 | 0.52 |
| 1/23/2016 | 0.11 |
| 1/29/2016 | 0.26 |
| 2/17/2016 | 0.45 |
| 2/18/2016 | 0.15 |
| 2/19/2016 | 0.11 |
| 3/3/2016 | 0.15 |
| 3/4/2016 | 0.28 |
| 3/5/2016 | 2.33 |
| 3/6/2016 | 0.73 |
| 3/7/2016 | 0.24 |
| 3/9/2016 | 0.27 |
| 3/10/2016 | 1.58 |
| 3/11/2016 | 1.28 |
| 3/12/2016 | 0.32 |
| 3/13/2016 | 0.82 |
| 3/20/2016 | 0.67 |
| 3/21/2016 | 0.32 |
| 4/9/2016 | 0.29 |
| 4/13/2016 | 0.2 |
| 4/22/2016 | 0.7 |
| 5/7/2016 | 0.11 |
| 6/17/2016 | 0.14 |
| 10/2/2016 | 0.15 |
| 10/3/2016 | 0.12 |
| 10/14/2016 | 0.54 |
| 10/15/2016 | 0.66 |
| 10/16/2016 | 0.14 |
| 10/24/2016 | 1.76 |
| 10/25/2016 | 0.85 |
| 10/28/2016 | 0.99 |
| 10/29/2016 | 0.28 |
| 10/30/2016 | 1.21 |
| 10/31/2016 | 0.34 |